Filing # 207088613 E-Filed 09/17/2024 03:33:22 PM

IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
IN AND FOR SUWANNEE COUNTY, FLORIDA

JAMES R. THOMAS; GEORGE
WYATT THOMAS and CAROLINE
LACE GABBARD, his wife; CLIFTON
WOODROW GREENE, JR.; AND
MICHELLE RICHARDS; AND ON
BEHALF OF A CLASS OF ALL OTHER
PERSONS SIMILARLY SITUATED,

      Plaintiffs,

vs.

CLASS REPRESENTATION

SUWANNEE VALLEY ELECTRIC
COOPERATIVE, INC., a Florida Not
for Profit Corporation; and RAPID
FIBER INTERNET, LLC, a Florida
Limited Liability Company,

      Defendants.

CASE NO. _24-CA-190_

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, JAMES R. THOMAS; GEORGE WYATT THOMAS
and CAROLINE LACE GABBARD, his wife; CLIFTON WOODROW GREENE,
JR.; MICHELLE RICHARDS (collectively, the "Named Plaintiffs" or the
"Representative Plaintiffs"), and bring this class action pursuant to FLA. R. CIV.
P. 1.220 for themselves, individually, and on behalf of a Class of all other
similarly situated Florida property owners, persons and entities, by and
through their undersigned counsel, and sue Defendants SUWANNEE VALLEY
ELECTRIC COOPERATIVE, INC. ("SVEC"), and RAPID FIBER INTERNET, LLC
("RFI") (together, "Defendants"), alleging that at all times material:

E-FILED
9-17-24

## PARTIES

1.      Representative Plaintiff, James R. Thomas is a resident of Suwannee County, Florida who owns property in Suwannee County, Florida, identified as tax parcel numbers 17-02S-13E-05240-000000, 18-02S-13E-05241-000000, 18-02S-13E-05241-001000, 14-02S-12E-09934-000000, 14-02S-12E-09936-000000 and 23-02S-12E-10014-000000.

2.      Representative Plaintiffs, George Wyatt Thomas, and Caroline Lace Gabbard, his wife, are residents of Suwannee County, Florida, who own property in Suwannee County, Florida, identified as tax parcel number 14-02S-12E-09938-000040.

3.      Representative Plaintiff Clifton Woodrow Greene, Jr. is a resident of Suwannee County, Florida, who owns property in Suwannee County, Florida, identified as tax parcel number 29-04S-14E-03230-000000.

4.      Representative Plaintiff Michelle Haas Richards is a resident of Columbia County, Florida, who owns property in Suwannee County, Florida, identified as tax parcel number 30-04S-14E-03239-002001.

5.      Defendant SVEC was and continues to be a non-profit electric cooperative, with its principal place of business in Suwannee County, Florida, and doing business in Suwannee, Lafayette, Hamilton and northern Columbia counties in the State of Florida.

6.      Defendant RFI was and continues to be a Florida Limited Liability Company with its principal place of business in Suwannee County, Florida.

2

Defendant RFI is a subsidiary of Defendant SVEC. At all relevant times, Defendant RFI provided, and continues to provide, residential and commercial telephone and internet services for profit in Suwannee, Lafayette, Hamilton and northern Columbia counties in the State of Florida, utilizing SVEC's electric power transmission and distribution system constructed on land owned by Representative Plaintiffs and Class Members.

## JURISDICTION AND VENUE

**7.** This is an action seeking declaratory relief, injunctive relief and damages exceeding $50,000.00, exclusive of interest, costs, and attorneys' fees.

**8.** This Court has jurisdiction of this action pursuant to Article V, section 5(b) of the Florida Constitution, which provides for the circuit courts to have original jurisdiction not vested in the county courts.

**9.** Venue is proper in Suwannee County, Florida, as both Defendants, SVEC and RFI, maintain their principal places of business in Suwannee County, Florida.

## NATURE OF THE ACTION

**10.** This action is a Florida class action brought to vindicate the rights of Representative Plaintiffs, and all similarly situated persons and entities (the "Class Members") who were deprived of property rights and money because of Defendants' wrongful acts and omissions, beginning at least in early 2023 and continuing to the present. Defendants' wrongful acts and omissions, in part,

3

constitute an unlawful scheme to cheat, steal and convert property rights, and the money derived from such property rights, belonging to Representative Plaintiffs and Class Members through Defendants' construction, operation, management, use, marketing, and leasing transfer of an unauthorized 4,100+ mile fiber optic communications network (the "Fiber to the Home Network" or "Network") utilizing SVEC's electric power transmission and distribution system constructed on land owned by Representative Plaintiffs and Class Members. The Network is being used, and will be used, to transmit commercial, third-party voice, data, and video communications and internet access for profit (collectively, General Broadband Communications") that are unrelated to the transmission or distribution of electricity and Defendants' electricity-related internal communications and violates the uniform granting language in the easements over Representative Plaintiffs' and Class Members' land (to the extent such easements exist).

    **11.**  Defendants' wrongful actions and omissions were committed willfully, maliciously, with intent to injure and damage Representative Plaintiffs and Class Members, and with reckless disregard of Representative Plaintiffs' and Class Members' legal rights, business relationships, property rights in their land, and the fruits of the use of their land.

    **12.**  Representative Plaintiffs bring this action on behalf of a Class (as described below) of all persons and entities who own land in Suwannee, Lafayette, Hamilton and northern Columbia counties in Florida (collectively,

4

"North Florida Counties") over which the Network was (and continues to be) constructed, operated, managed, used, allowed to be used, marketed, leased and/or transferred by Defendants and/or other telecommunications companies for the transmission of General Broadband Communications unrelated to the transmission and distribution of electricity and Defendants' electricity-related internal communications. Representative Plaintiffs, for themselves and Class Members, seek actual damages, all amounts by which Defendants have been unjustly enriched, court costs, attorneys' fees, litigation expenses, a factor for the time value of money, and equitable relief as may be appropriate, including, without limitation, declaratory relief, injunctive relief, an equitable accounting, and/or disgorgement of Defendants' financial benefits from the Network.

## CLASS ACTION ALLEGATIONS

**13.** This action is brought by Representative Plaintiffs as a class action, individually and on behalf of all other similarly situated persons and entities, under the provisions of Rule 1.220 of the Florida Rules of Civil Procedure.

**14.** Representative Plaintiffs represent a class (the "North Florida Landowner Class" or the "Class") consisting of:

> All persons and entities that own real property in Suwannee, Hamilton, Lafayette and northern Columbia County underlying Defendants' electric power transmission and distribution lines and on or in which Defendants have installed, without authorization, or announced plans for the unauthorized installation of fiber-optic cable for the transmission of General Broadband Communications unrelated to the transmission or distribution of electricity and Defendants' electricity-related internal communications.

5

15.    Excluded from the Class are all railroad rights-of-way, rights-of-way owned by any of the Defendants, and/or rights-of-way owned by any federal, state and/or local governmental agency. Representative Plaintiffs reserve the right to modify the Class definition as relevant information is obtained.

16.    The term "Class Member" includes real property owners in the enumerated Florida Counties (i) underlying SVEC's electric transmission and/or distribution lines is encumbered by Right of Way Easement ("ROW Agreements")[1] procured or owned by SVEC, and/or (ii) whose property underlying SVEC's electric transmission and/or distribution lines are not encumbered by ROW Agreements given to Defendants at all.

17.    RFI owns no independent easement rights; its right to use the SVEC ROW Agreements is derived from SVEC. The same fiber optic cable used by SVEC for its internal communications is being used and marketed by RFI for its General Broadband Communications business, the profits from which RFI allegedly returns to its parent, SVEC. Accordingly, joint reference herein to "Defendants" applies to SVEC and RFI.

18.    Class Members may easily be identified through Defendants' Network records and the enumerated Florida county real estate records.

---

[1]    Throughout the Complaint, Plaintiffs refer to the original easements acquired by SVEC for transmission of electricity as "easements" or "ROW Agreements."

6

**19.**   Upon information and belief, the number of Class Members is in the thousands, rendering the Class so numerous that individual joinder of all Class Members is impracticable. On information and belief, there are more than 11,000 SVEC ROW Agreements with identical relevant granting language affecting landowners in the North Florida Counties. There also are numerous Class Members in a number known only by Defendants who own land underlying SVEC electric power transmission and/or distribution facilities and the Network for which SVEC does not have ROW Agreements in any form.

**20.**   This case does not involve a dispute over the title to property in that Representative Plaintiffs and Class Members hold fee simple title to their property subject to (i) the specific use conveyed expressly to SVEC by the ROW Agreements, and/or (b) Defendants' unauthorized use of Representative Plaintiffs' and Class Members' property without any written easement or other agreement.

**21.**   Defendants have illegally installed, or plan to install, over 4,100 miles of fiber-optic cable throughout the enumerated North Florida Counties on Representative Plaintiffs' and Class Members' land that, at best for Defendants, is subject only to a limited electric-utility easement or occupancy contained in the ROW Agreements, and, at worst for Defendants, is not subject to any easement at all. Defendants, without authorization, are using, and plan to use, the Network installed over Representative Plaintiffs' and Class Members'

7

property to transmit General Broadband Communications as a separate business distinct from the transmission and distribution of electricity.

**22.**    This action should be certified as a class action because:

(a)    As owners of (i) ROW Agreement encumbered lands, or (ii) lands with no encumbering easement, Representative Plaintiffs and Class Members are entitled to compensation for Defendants' improper commercial use and occupation of their land for purposes other than the transmission or distribution of electricity, disgorgement of the revenues wrongfully flowing to Defendants from that improper use and occupation, and declaratory relief;

(b)    Representative Plaintiffs' claims are typical of the claims of the other Class Members; and

(c)    Representative Plaintiffs will fairly and adequately represent the interests of the North Florida Landowner Class. Representative Plaintiffs own parcels identified herein are within the area intruded upon by Defendants and are like the parcels of other Class Members. Representative Plaintiffs have owned their property parcels for many years in the area affected by the intrusion. Representative Plaintiffs possess sufficient knowledge and involvement in the matter to fairly and adequately protect the interests of each Class Member. Representative Plaintiffs have no interests adverse to the interests of the Class, their counsel are experienced in handling class actions and other complex commercial and consumer litigation, and Representative Plaintiffs will fairly and adequately represent the interests of all Class Members.

**23.**    There are questions of fact common to the Class, which predominate over questions affecting any individual Class Members, including, without limitation:

(a)    Whether Defendants adopted policies, procedures, or a pattern or practice to install and operate fiber-optic cable for General Broadband Communications purposes on (1) ROW Agreement encumbered lands and (2) lands unencumbered by a ROW Agreement, without seeking or obtaining Representative Plaintiffs' and Class Members' authorization and consent and/or compensating them for the right to do so;

8

(b)    Whether Defendants knew that they held or leased easements granting access only for the limited purposes of transmitting or distributing electricity, and whether Defendants acted with malice or reckless disregard for Representative Plaintiffs' and Class Members' rights by installing the Network to transmit General Broadband Communications despite that knowledge;

(c)    Whether Defendants made any assertions regarding their ownership interest or other occupancy rights in (i) ROW Agreement encumbered lands and (ii) lands unencumbered by a ROW Agreement, and whether Defendants knew those assertions to be false, or whether those assertions were made recklessly and without adequate investigation of their truth;

(d)    Whether Defendants negotiated for or entered into contracts purporting to transfer rights of use or ownership to (i) ROW Agreement encumbered lands and (ii) lands unencumbered by a ROW Agreement, for General Broadband Communications, and whether Defendants knew or should have known that any such transfer or use exceeded the limited scope of their easement rights, if any;

(e)    Whether by constructing and operating the Network for General Broadband Communications, Defendants violated (and continue to violate) their ROW Agreements with Representative Plaintiffs and Class Members and/or trespassed (and continue to trespass) on Representative Plaintiffs' and Class Members' land for which Defendants have no ROW Agreements;

(f)    Whether Defendants received revenues from their improper use, occupancy, or transfer of (i) ROW Agreement encumbered lands and (ii) lands unencumbered by ROW Agreements, and the amount of such revenues;

(g)    Whether Defendants refuse to acknowledge their lack of ownership in, possessory control over, or right to exercise dominion or control over (i) ROW Agreement encumbered lands and (ii) lands unencumbered by ROW Agreements beyond that necessary for the transmission or distribution of electricity; and

(h)    Whether any Defendant has announced plans to expand the installation of fiber-optic cable on (i) ROW Agreement encumbered lands and/or (ii) lands unencumbered by a ROW Agreement without obtaining additional easements, and whether it intends to use that fiber optic cable for purposes other than the transmission or distribution of electricity.

9

**24.** There also are questions of law common to the Class, which predominate over questions affecting any individual Class Members, including, without limitation:

(a)    Whether Defendants' conduct in (i) entering onto ROW Agreement encumbered lands and lands unencumbered by a ROW Agreement, for the installation and maintenance of fiber-optic cable, and (ii) operating a commercial-communications network to transmit General Broadband Communications through such cable(s), without seeking or obtaining Representative Plaintiffs' and Class Members' consent and/or compensating them for the privilege, exceeded the limited scope of ROW Agreements, to the extent such exist;

(b)    Whether Defendants' conduct in failing to remove the fiber optic cable installed without seeking or obtaining Representative Plaintiffs' and Class Members' consent on (i) ROW Agreement encumbered lands and (ii) lands unencumbered by a ROW Agreement constitutes acts of trespass or unlawful detainer, which are present and continuing;

(c)    Whether Defendants' conduct common to the Class has resulted in, or will result in, Defendants being unjustly enriched at the expense of Representative Plaintiffs and Class Members, or in Defendants retaining a benefit to the detriment and loss of Representative Plaintiffs and Class Members, in frustration of the fundamental principles of justice, equity, and good conscience, and thus constituting unjust enrichment;

(d)    Whether Defendants' conduct common to the Class demonstrated willfulness, malice, or recklessness, or whether Defendants proceeded with conscious disregard for the rights of others, therefore entitling Representative Plaintiffs and Class Members to punitive damages; and

(e)    Whether Defendants' conduct in (i) entering onto ROW Agreement encumbered lands and lands unencumbered by a ROW Agreement, for the installation and maintenance of fiber-optic cable, and (ii) operating a commercial-communications network to transmit General Broadband Communications through such cable(s), without seeking or obtaining Representative Plaintiffs' and Class Members' consent, is unlawful and whether the Court should enjoin such further installation.

10

**25.**    Further questions of law common to the claims of Representative Plaintiffs and of each member of the Class include, *inter alia*:

(a)    Defendants' liability under Representative Plaintiffs' claims and causes of action set forth below;

(b)    the appropriate measure of damages;

(c)    the potential defenses raised by Defendants;

(d)    the availability of declaratory or injunctive relief; and

(e)    remedies available under Florida law.

**26.**    The particular facts and circumstances of the claims and causes of action advanced by Representative Plaintiffs are typical of those of each Class member in that the nature of the trespass, unjust enrichment, unlawful detainer, and need for injunctive relief and declaratory relief is the same for each Class member; the relevant granting language in the ROW Agreements at issue here is identical across all such agreements; the cause of damage for the Class is a single course of conduct which is the same for each Class member; the causes of action occurred during the same general period of time; each Class member is an affected landowner; the types of damages incurred and the damages per ROW Agreement or segment of right-of-way unencumbered by a ROW Agreement are the same for each Class member in a particular line segment (and may be easily measured and apportioned on a per foot basis), and Defendants' anticipated defenses are the same for each Class member.

**27.**    Class certification, therefore, is appropriate pursuant to FLA. R.

11

CIV. P. 1.220(b)(1) because the prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to other Class Members, which would establish incompatible standards of conduct for Defendants, and which would, as a practical matter, be dispositive of the interests of the other Class Members not parties to such adjudications, substantially impairing or impeding their ability to protect their interests.

**28.**     Class certification, therefore, is appropriate pursuant to FLA. R. CIV. P. 1.220(b)(2) because Defendants have acted on asserted grounds generally applicable to the Class, so that final injunctive relief and/or the corresponding declaratory relief is appropriate with respect to the Class as a whole.

**29.**     Class certification also is appropriate pursuant to FLA. R. CIV. P. 1.220(b)(3) because the above questions of law and fact common to Class Members predominate over any questions affecting only individual Members, and a class action is a superior method for the fair and efficient adjudication of the controversy because:

**30.**     The expense and burden of individual litigation would effectively make it impracticable for individual Class Members to seek redress for the wrongs alleged in this Complaint. A class action will foster an orderly and expeditious administration of Representative Plaintiffs' and Class Members' claims, economies of time, effort and expense, and uniformity of decision.

12

**31.** Not permitting this matter to proceed as a class action would be contrary to the public policy encouraging the economies of judicial, attorney, and litigant time and resources. Public policy and judicial precedent favor class actions for the purpose of, *inter alia*, deterring wrongdoing and providing judicial relief for small, individual claims with a common basis.

**32.** Absent a class action, Defendants will retain the benefits of their wrongdoing despite their serious violations of the law. This action, therefore, should be certified as a class action.

## ALLEGATIONS OF THE REPRESENTATIVE PLAINTIFFS

**33.** Plaintiff JAMES THOMAS owns in excess of 200 acres of land in Suwannee County, Florida underlying SVEC's electric transmission and/or distribution lines. Of those 200 acres, 10 acres are encumbered by a SVEC ROW Agreement. The remaining acreage has been crossed by SVEC electric lines without a ROW Agreement.

**34.** Plaintiffs GEORGE WYATT THOMAS and CAROLINE LACE GABBARD own 20 acres of land in Suwannee County, Florida underlying SVEC's electric transmission or distribution lines encumbered by a SVEC ROW Agreement.

**35.** Plaintiff CLIFTON WOODROW GREENE, JR. owns 60 acres of land in Suwannee County, Florida underlying SVEC's electric transmission or distribution lines.

13

**36.** Plaintiff MICHELLE RICHARDS owns 21 acres of land in Suwannee County, Florida underlying SVEC's electric transmission or distribution lines encumbered by a SVEC ROW Agreement.

**37.** Either by their terms or by operation of law, the ROW Agreement granting language, which is uniform across all the ROW Agreements encumbering Representative Plaintiffs' and Class Members' land, only grant Defendants a limited electric utility easement or occupancy:

> "...the right, privilege, and easement to reconstruct, operate and maintain for such period of time as it may use the same or until the use thereof is abandoned, and electric line or lines for the transmission and distribution of electricity, including necessary communication and other wires, poles, guys, anchors, ground connections, attachments, surface testing terminals, fixtures, equipment, and accessories (hereinafter collectively referred to as "facilities") desirable in connection therewith over, upon, across and under the following described lands in: _____ County Florida..."

**38.** None of the Defendants ever held, and cannot use or create any rights in, under, over, or across the ROW Agreement lands for any purpose other than to transmit and distribute electricity and Defendants' electricity-related internal communications.

**39.** Fiber-optic cable for the purpose of transmitting General Broadband Communications was installed alongside SVEC's electric lines on Representative Plaintiffs' property sometime between June 1, 2023, and May 1, 2024. None of the Representative Plaintiffs were given prior notice of its installation.

**40.**    Defendants did not negotiate or pay for an easement that permits the installation or use of fiber-optic cable for General Broadband Communications.

**41.**    SVEC's initial press release about the Network stated that it planned "to build a fiber-optic network across the co-op's service territory." (*Exhibit A*) "The Fiber network will also be used to deliver 100% fiber to the home (FTTH) high-speed internet service to SVEC's consumer-Members through the cooperative's newly formed subsidiary, Rapid Fiber Internet, LLC.") (*id.*) Further, "The project...will span over 4,100 miles of line to deliver high-speed fiber internet services to homes farms and businesses across Florida's Hamilton, Lafayette and Suwannee Counties, and northern Columbia County. The goal is to ultimately extend fiber internet across to all SVEC customer Members." *Id.* However, the Smart Grid & Fiber to the Home Project FAQ on RFI's website states "Service may be offered to non-SVEC Members in the future..." (*Exhibit B*)

**42.**    The Network is being built to correspond to the paths of the electric feeder lines that transmit and distribute electric power from SVEC's substations. Below is a map of the Network appearing on RFI's website (www.rapidfiber.com/project-info/).

*(See following page for RFI map)*

15



**43.**    The RFI map shows that substantial miles are under construction or to be constructed in the North Florida Counties.  At the time of this filing, RFI website represented that "All Zones in Phase are available for service." (*id.*)

**44.**    RFI's website (*id.*) also outlines the steps to be performed by Defendants to provide the service as follows:

16

   

**Make Ready**
Preparing the power
poles for fiber lines &
relocating other utilities

**Fiber Splicing**
Connecting fiber lines
back to the hut, which is
the source of internet

**Design/Engineering**
Creating a digital
blueprint for the
fiber network

**Fiber Construction**
Attaching fiber lines
to the power poles

45.     Notably missing from the steps outlined is the acquisition of appropriate easements from property owners for the Network.

46.     Nevertheless, Defendants have installed or are installing and operating the Network to transmit General Broadband Communications, without authorization, over thousands of miles of (i) ROW Agreement lands and (ii) lands not subject to any easement rights given to Defendants.

47.     On information and belief, Defendants made the conscious business decision to forego the time-consuming and expensive process of negotiating and paying for the necessary easement rights to construct the Network, but instead, deliberately disregarded Representative Plaintiffs' and Class Members' property rights and installed and operate the Network to transmit General Broadband Communications in violation of the ROW Agreements and/or over land for which they have no right to construct and operate such a Network.

48.     On information and belief, Defendants' standard practice and policy has been to not inform Class Members about the installation of fiber-

17

optic-cable, and Defendants have neither obtained consent from, nor paid compensation to, Class Members for such unauthorized use of their land.

**49.** Instead, Defendants now surreptitiously seek to acquire said easement rights by the inclusion of single paragraph buried in the 14-page Service Agreement located on RFI's website (rapid-fiber.com/legal/service-agreement/) and misleadingly titled - Access to Customer Premises:

Access to Customer Premises

> As a condition of receiving the Services, and **without compensation**, the Customer grants **a perpetual easement** on and through the service location to provide data and, if applicable, voice services on transport fiber, distribution fiber, and service extension fiber, if applicable, for Service to both the Customer **and to other customers**, and to perform necessary maintenance, service upgrades, and periodic right-of-way maintenance by or for Rapid Fiber; its parent company Suwannee Valley Electric Cooperative; and at Rapid Fiber's direction, a third party. This easement, in addition to all other rights and privileges afforded by Florida law, explicitly allows Rapid Fiber and its agents the right to enter Customer's property at which the Services and/or Rapid Fiber Equipment will be provided for the purposes of installing, configuring, maintaining, inspecting, upgrading, replacing, and removing the Services and/or Rapid Fiber Equipment used to receive any Services.

(emphasis added). (Exhibit C). This is tantamount to an admission that Defendants know that they do not have the right to construct and operate the Network for General Broadband Communications.

**50.** Defendants also have contracted with each other and upon information and belief, with third parties, to use the Network for General

Broadband Communications installed on ROW Agreement lands and/or over land for which they have no right to construct and operate such a Network.

**51.** By using the Network to transmit General Broadband Communications, Defendants have received, or expect to receive, revenue from the unauthorized and uncompensated use of ROW Agreement lands and land for which they have no right to construct such a Network. In public correspondence and filings for Grant Applications and regulatory purposes, Defendants have conservatively estimated annual Network revenues of more than $7,500,000.00 for the three zones of the Network build. Defendants should disgorge this revenue to Representative Plaintiffs and other Class Members since they have no right to construct and operate the Network for General Broadband Communications.

**52.** Defendants knew or should have known that they held or used easements valid only for purposes of transmitting and/or distributing electric power, and that they had no right to use, install, maintain, or operate fiber-optic cable on Representative Plaintiffs' and Class Members' land for General Broadband Communications. Defendants acted, and continue to act, with reckless disregard by constructing and operating the Network for General Broadband Communications in the absence of paying for and entering into amended ROW Agreements and/or new ROW Agreements where none exist that grant them the right to do so.

**53.** At the time that SVEC acquired the large majority, if not all, of the ROW Agreements from Representative Plaintiffs and Class Members, SVEC did not have the statutory authority to engage in the provision of General Broadband Communications. Only in 2023, after the passage of Florida HB 2023-1221 that amended Section 425.04, Fla Stat. (2022), did rural electric cooperatives gain the ability to engage in the activity of providing for General Broadband Communications to their customers, effective July 1, 2023.

**54.** Thus, under Florida law, at the time SVEC acquired the ROW Agreements it actually acquired, SVEC could not obtain, and indeed, did not obtain, the necessary easements and landowner authorizations to construct, operate, own, or control a Network for General Broadband Communications, and was barred from acquiring easements by eminent domain or otherwise for commercial communication purposes. To be sure, such easement rights were not contemplated by Florida law in existence at the time SVEC obtained the ROW Agreements it actually obtained.

**55.** Representative Plaintiffs' and Class Members' ROW Agreements granted to SVEC decades ago - like the JAMES R. THOMAS, GEORGE WYATT THOMAS, GREENE and RICHARDS ROW Agreements – are limited solely to transmitting and distributing electric power. The ROW Agreements specifically do not grant SVEC, RFI, and/or others the right to construct and operate commercial communications facilities for General Broadband Communications.

20

**56.** Other Class Members, like Representative Plaintiff JAMES R. THOMAS, own land underlying SVEC's electric power transmission and distribution lines that were constructed without any agreement whatsoever with him or other similarly situated Class Members, informally or otherwise. In these situations, SVEC, RFI, and/or others do not possess any legal right to use their land for any reason, much less, General Broadband Communications.

**57.** Other Class Members own lands underlying SVEC's electric power transmission and distribution lines under an informal, unrecorded, permissive access for the limited purpose of providing electric power. Under the informal, permissive use granted SVEC, SVEC never held - and cannot use, lease, create, convey or otherwise transfer or create – any rights, in, under, over or across Class Members' lands. Thus, SVEC, RFI, and/or others do not have any legal right to transmit General Broadband Communications thereon for a fee or otherwise.

**58.** Nevertheless, beginning in the late 2023 through 2024, Defendants began installing fiber optic communication lines and wireless telecommunication equipment for purposes of selling and transmitting General Broadband Communications in, under, over, and across lands owned by the Representative Plaintiffs and Class Members—without authorization and without compensating Representative Plaintiffs and Class Members.

**59.** SVEC's easement rights hinge on the clear and unambiguous terms of its ROW Agreements, which restrict SVEC to installing "necessary

21

communication or other wires" "for the transmission and distribution of electricity" and provide no authority for any purpose not related to the transmission of electricity.[2]

**60.** Although the ROW Agreements (only on some Class Members' property) may authorize SVEC to construct communication lines for sending

---

[2] Alternatively, any ambiguity in the ROW Agreements must be resolved in favor of Representative Plaintiffs and Class Members because SVEC drafted the ROW Agreements and created the ambiguity. Moreover, any ambiguity in the ROW Agreements must be resolved against the right of SVEC to utilize the lands as part of a business venture to provide General Broadband Communications to the public for a fee in light of surrounding circumstances at the time the ROW Agreements were created, as well as the use of the ROW lands after they were created. These surrounding circumstances include, but are not limited to:

(a) Florida statutes and the SVEC corporate charter did not permit General Broadband Communications;

(b) Florida law at the time prohibited ownership of an easement for telecommunications by an entity not licensed by the state to provide telecommunications services;

(c) SVEC was not at the time of acquisition of the ROW Agreements (and currently is not) licensed by the Florida Public Service Commission as a telecommunications company;

(d) The filing of condemnation actions, and the threatened filing of condemnation actions, were used to coerce landowners into signing and delivering the ROW Agreements to SVEC;

(e) The rights obtained by SVEC by such ROW Agreements could be no broader than the rights SVEC could obtain from a condemning court, and do not include the authority to engage in General Broadband Communications offered to the public for a fee; and

(f) For decades, SVEC limited the use of communications systems in its rights-of-way to the transmission and distribution of electricity and electricity-related internal communications.

22

communication signals to stations and switches to facilitate the transmission and distribution of electric power, the ROW Agreements do not allow Defendants or any third party to provide commercial-communication services, such as the General Broadband Communications, to anyone for a fee. The scope of the ROW Agreements permits SVEC to take certain actions necessary for the safe, reliable and efficient transmission and distribution of electric power—and that's all. The authority granted by the ROW Agreements does not authorize SVEC to install fiber-optic cables for General Broadband Communications.

**61.**    Since SVEC has no legal right to use its easements for non-electric-related communications, it may not authorize a third party, an affiliate, or a subsidiary to do so.

**62.**    The owner of the fee estate retains all other rights relative to use the fee estate for non-electric-related communications purposes. Defendants disregarded, and continue to disregard, Representative Plaintiffs' and Class Members' fee ownerships by ignoring the retention rights in their land.

**63.**    The original context in which SVEC sought and obtained the ROW Agreements was "to construct, operate...electric lines or lines...for the transmission and distribution of electricity..."    For years after SVEC's acquisition of the ROW Agreements, the equipment on these easements consisted only of electric transmission or distribution lines, static wires, and poles. These structures served the public convenience contemplated under the

23

ROW Agreements and SVEC's corporate charter. (*i.e.,* the transmission and distribution of electric power).

**64.** SVEC received from the affected landowners a legal right to use the easements for a particular use; specifically, the transmission and distribution of electricity. Defendants now are using the easements for entirely different uses; to wit, commercial communications offered to the public for a fee—the General Broadband Communications. Such uses go far beyond the terms and scope of the ROW Agreements granted to SVEC.

**65.** SVEC, as the holder of the ROW Agreements, also may not assign any part of its easement rights to third parties for a purpose or right that is not included among the specific rights granted by Representative Plaintiffs and Class Members to SVEC in the ROW Agreements. As such, the terms of the ROW Agreements bar SVEC from assigning the rights granted therein for commercial communications of any kind, including General Broadband Communications.

**66.** With the advent of high-speed internet access enabled by fiber optic cables, SVEC developed (and is executing) a plan to create an extensive communications network using fiber optic cable and other telecommunications apparatuses for General Broadband Communications.

**67.** However, in doing so, SVEC is improperly utilizing pre-existing easement rights obtained from Representative Plaintiffs and Class Members as the basis to place unauthorized fiber optic cable and other telecommunication

24

apparatuses upon its existing easements to market, sell, and transmit General Broadband Communications—when such pre-existing easements (*i.e.*, the ROW Agreements) do not grant Defendants such rights.

**68.**   Undaunted, with the attitude that it would seek Class Members' permission later (*see* Paragraph 49, above), SVEC decided to use its existing electric power easements to transmit the unauthorized General Broadband Communications because it afforded SVEC the most cost-effective means of installing the subject equipment—notwithstanding the fact that it did not have the legal right to do so, it failed and refused to disclose its illegal activities to the affected landowners, and/or it failed to pay the landowners for the privilege of using their land for SVEC's illegal purposes.

**69.**   In short, assigning SVEC's easements to third parties—such as RFI—for General Broadband Communications was never a right in the extremely narrow property rights SVEC acquired in the ROW Agreements obtained from Representative Plaintiffs and Class Members. The underlying servient property owners retained all interests in the servient estates not inconsistent with the electric transmission purposes set forth in the easements. SVEC failed to adhere to the use restrictions in the ROW Agreements when SVEC assigned the easements for General Broadband Communications purposes to RFI without obtaining the consent of the landowners who own the properties, or otherwise pay them for the privilege.

**70.** In July 2022, SVEC announced its plans to a build a fiber optic network and offer FTTH high speed internet. (Exhibit A). Also in July 2022, SVEC launched RFI, a new wholly owned subsidiary, to sell the fiber optic network capacity to transmit General Broadband Communications. In January 2023, RFI applied to the Florida Public Service Commission (PSC) to provide local telecommunications services. On March 27, 2023, the PSC approved RFI's application for a certificate to provide local telecommunications service effective April 18, 2023. (Exhibit D).

**71.** RFI is attempting to gain a large commercial financial advantage through use of Representative Plaintiffs' and Class Members' real property rights without securing the right, or obtaining the consent, to use their lands in a manner not otherwise permitted by SVEC's existing easements.

**72.** SVEC and RFI's Network includes the fiber optic cable crossing the land owned by Representative Plaintiffs and Class Members. Defendants intend to continue installing the fiber optic cable to form a continuous and seamless FTTH fiber optic Network throughout the North Florida Counties. Defendants have committed, and continue to commit, an unlawful act within Florida (as hereafter alleged) by utilizing its Network and wireless communications systems on Representative Plaintiffs' and Class Members' lands to generate revenues and profits from General Broadband Communications without the legal right or authority to do so.

26

## ALLEGATIONS COMMON TO ALL COUNTS

**73.** This is a case where Representative Plaintiffs and Class Members have a shared interest in common property at stake.

**74.** Defendants generate revenue by furnishing Network capacity and other communications services for General Broadband Communications purposes to third parties. The revenue generated, and the physical infrastructure supporting this revenue generation, are a single common fund created through the unlawful use of Representative Plaintiffs' and Class Members' property over which the illicit communication corridors exist.

**75.** Because Defendants operate a unified Network communication system, individual property owner damages cannot be ascertained without first determining the rights of all property owners in relation to the revenue and profits generated from the Defendants' illicit Network.

**76.** Under a unified system, each property owner is an owner of an undivided interest in the income and value generated using the communication corridors and is lawfully entitled to be compensated in a reasonable manner for his or her property interest.

**77.** To determine the value for which each Representative Plaintiff and each Class Member was deprived, and the corresponding damages, the total value of the Network must first be determined.

**78.** Anything short of a total system value determination will produce unjust and inconsistent damage awards because Defendants' Network crosses

27

and overlaps several North Florida Counties. Thus, there is no practical way to break down the receipts, county by county, or by judicial district, to determine damages.

**79.** Damages must necessarily be allocated by segment (portion of the Network) or by Network, with all undivided interests participating in the segment or Network allocation process.

**80.** Inconsistent damage results would violate Representative Plaintiffs' and Class Members' due process rights.

**81.** Providing notice and participation rights to all property owners under the Network is the appropriate method for determining damages and will provide fair and reasonable allocation of damages contemplated and necessitated by due process.

**82.** An analysis of the General Broadband Communications revenues generated by the Network is necessary to quantify the damages due to Representative Plaintiffs and Class Members.

**83.** Under Florida law, Defendants do not possess, and never have possessed, eminent domain power to secure an easement for General Broadband Communications purposes.

**84.** Where SVEC did not use the original easements to transmit General Broadband Communications for almost 30-40 years, the eminent domain power SVEC exercised or threatened to exercise did not result in SVEC acquiring a General Broadband Communications easement.

28

**85.**   Since the advent of long-distance fiber optic transmission technology in the mid-1980's, the telecommunications industry in the United States has embarked upon a transition from older electric copper wire and microwave technology to modern non-electric fiber optic technology.

**86.**   Fiber optic cable is "dielectric," meaning it does not carry electricity but allows digital signals to be transmitted at the speed of light through glass fibers. An operational fiber optic network only transmits light and information; it does not generate, transmit, or distribute electric energy.

**87.**   Nevertheless, there has been attempted widespread use of existing easements for General Broadband Communications. In most cases, fiber optic cables are co-located within existing road, railroad, pipeline, or electric transmission line rights-of-way. Fiber optic systems enable telephone, television, cablevision, and digital computer data to be transmitted in astounding volumes on a single optical fiber. Here, the capacity of Defendants' Network is sufficient to permit the transmission of enormous volumes of commercial communications, which produce large financial benefits to Defendants that bear no reasonable relationship to the original intended purposes of the granting language in The ROW Agreements—where such agreements exist.

**88.**   Representative Plaintiffs and Class Members should be allowed to take advantage of the increase in demand for their land and its unlimited potential for use as a General Broadband Communications corridor.

89.    However, Defendants now seek to gain large commercial financial advantages through use of the real estate fee interests of Representative Plaintiffs and Class Members without securing and/or paying for the right to do so.

90.    Defendants are using the electric power easements in the ROW Agreements originally obtained by SVEC—where such agreements exist—as well as land over which they have no easements to engage in a new commercial business venture markedly and materially different from the business of electric power transmission and distribution (*i.e.*, the transmission of General Broadband Communications).

91.    Other industry participants with linear easements pay landowners to acquire adjacent or co-located general communication easements. Defendants should have done the same with respect to the land owned by Representative Plaintiffs and Class Members—rather than surreptitiously commandeering their property rights with no compensation.

92.    By secretly installing the General Broadband Communications Network without the right to do so, Defendants have intruded, and continue to intrude, on the property rights and interests of Representative Plaintiffs and Class M Members as owners of the fee estates, thereby devaluing the subject fee estates.

93. Devaluation of the fee estates through these uncompensated intrusions upon Representative Plaintiffs' and Class Members' valuable property interests is an unlawful burden upon such fee estates.

94. The burden on the servient estates over which Defendants' illicit and unauthorized Network is located has unreasonably and substantially increased, and is not merely incidental.

95. As an example, present on various Class Members' property as part of the Network are inspection portals installed on electric distribution lines, which consist of wires coming down from the top of the distribution lines and running into a small metal box constructed on numerous poles. The purpose of these inspection portals is to allow the testing and calibrating of the fiber optic wires and systems located along the Network. Such inspection portals are located at periodic intervals along the Network on lands owned by the Representative Plaintiffs and Class Members. The presence of the inspection portals on the Representative Plaintiffs' and Class Members' property is visually displeasing. They also increase the frequency and nature of inspection and maintenance activities on their land over and above that required for the distribution of electric power, thereby increasing greatly the burden on the servient estates.

96. Further, in 2023, the Florida legislature passed Chapter 2023-199 creating section 364.391, *Fla. Stat. (2022)*, entitled "Rural electric cooperatives engaged in the provision of broadband," stating, in part:

31

> (2) If a cooperative engages in the provision of broadband:
>> (a) All poles owned by the cooperative are subject to regulation under s. 366.04(8) on the same basis as if such cooperative were a public utility under that subsection; ...

Thus, unless Defendants' access to the Network it installed on Representative Plaintiffs' and Class Members' property is found to be beyond the terms of the ROW Agreements and/or improper because there is no ROW Agreement, Defendants will be forced to allow all telecommunications carriers access to its power poles in the rights of way for the construction of even more fiber optic lines. If Defendants have the right to assign their use of the easements to third parties for General Broadband Communications, they effectively "own or control" the easements, and Section 364.391 Fla. Stat. (2022) applies. Unlimited access by any and all telecommunication carriers to the easements will greatly increase the burden on the servient estates in contravention of Florida law and the express language of the ROW Agreements—where such exist.

**97.** Should Defendants be permitted to use Representative Plaintiffs' and Class Members' existing ROW Agreement easements for General Broadband Communications, telecommunication activities in the easements would not be limited to fiber optic wires and lines but could include various other equipment and apparatuses used by other communication companies, including wireless companies. The installation of any of these appurtenances would greatly increase regular maintenance and repair activities, thereby

unreasonably increasing the activity and burden on the servient estates. Representative Plaintiffs and Class Members allege, upon information and belief, that Defendants have made available (or will make available) to other companies) the use of the ROW Agreement lands and non-ROW Agreement lands for General Broadband Communications, including wireless telecommunications activities.

**98.** The presence of third parties on Representative Plaintiffs' and Class Members' lands greatly increases the liability exposure of the holders of the servient estates for negligent acts or omissions on their lands. The potential tort liability of the servient estate holders would no longer be limited to the original grantee, SVEC, but would include any and all third parties occupying the rights of way. Damages that the servient estate holder might inadvertently cause to fiber systems on the easements could result in excessive, expensive, burdensome, and unwarranted liability.

**99.** Through their wrongful installation of the Network for General Broadband Communications, Defendants have already increased the intensity of inspections, preventive services, replacements, and repairs that have burdened Representative Plaintiffs' and Class Members' property. This includes, among other things, increased aerial spraying of herbicides that may kill crops or normal residential vegetation and increased use of noisy heavy machinery, such as wood chippers, sprayers, and tractors.

33

**100.** Should the continued use of Representative Plaintiffs' and Class Members' property for General Broadband Communications be permitted, the intrusiveness of routine and emergency maintenance activities on the easements would, as the terms of the ROW Agreements provide, no longer be limited to the needs of transmitting and distributing electric power. The easements would be expanded to include the needs of numerous third parties for General Broadband Communications of all kinds worldwide. This would be an additional and unlawful burden upon Representative Plaintiffs' and Class Members' fee estates.

**101.** Defendants' wrongful use, sale, lease, license, or other use of the Network constructed in, over, under and/or across the lands owned by Representative Plaintiffs and Class Members to third parties for General Broadband Communications:

(i) impose upon the ROW Agreement lands and non-ROW Agreement lands an unlimited General Broadband Communications business not contemplated or authorized by the terms of the ROW Agreements or otherwise;

(ii) constitute a burden and unlawful presence upon the land owned by Representative Plaintiffs and Class Members; and

(iii) constitute an illegal infringement upon the absolute legal right of Representative Plaintiffs and Class Members to all interests not inconsistent with the terms of the ROW Agreements (to the extent such exist).

**102.** As a direct and proximate result of Defendants' above-described past, present, and continued future unlawful activities, Representative Plaintiffs and Class Members have suffered, and will continue to suffer,

34

unreasonable damage and injury to their property, property rights, and finances in the form of, *inter alia*:

(i) For such lands for which ROW Agreements exist, the fair market value Defendants should have paid for the right to construct, operate, maintain, market, use, sell and/or lease the SVEC right-of-way for purposes other than transmitting and distributing electricity and their electricity-related internal communications;

(ii) For such lands for which ROW Agreements do not exist, the fair market value Defendants should have paid for the right to construct, operate, maintain, market, use, sell and/or lease the SVEC right-of-way for purposes other than transmitting and distributing electricity and their electricity-related internal communications;

(iii) The huge capacity of Defendants' Network that absorbs greatly the long-haul telecommunications market in the North Florida geographic area of Representative Plaintiffs' and Class Members' land precludes them from selling telecommunications easements along these rights-of-way to others;

(iv) A physical burden on their land in the form of the Network facilities and other communication apparatuses, and the resulting entry on their land to construct, repair and maintain the Networks and such apparatuses; and

(v) The legal burden on their land in the form of additional easement rights that could be expanded into communications facilities of other entities that adds substantial legal burdens to Representative Plaintiffs' and Class Members' property.

**103.** It was unnecessary for Defendants to cause such damages to accomplish the original purpose of the ROW Agreements; to wit, the transmission and distribution of electric power.

**104.** Defendants never intended originally to install fiber optic cable and other communications apparatuses on the ROW Agreement lands. At the time the ROW Agreements were obtained, there were no reasonable expectations

35

that (i) the ROW Agreement lands would ever support fiber optic cable for the purpose of General Broadband Communications; (ii) using the ROW Agreement lands to transmit General Broadband Communications does not fall within the purposes for which the ROW Agreements were created; and (iii) the installation, maintenance, operation, and conveyance to third parties of Defendants' Network and other communications systems has, and will continue to, burden Representative Plaintiffs' and Class Members' property and cause them to suffer damages.

## CLAIMS AND CAUSES OF ACTION

### COUNT I
### CONSTRUCTIVE TRUST

**105.** The preceding factual statements and allegations contained in paragraphs 1 through 104 are incorporated herein by reference.

**106.** This is an action to establish a constructive trust, to restore Representative Plaintiffs' and Class Members' property rights and prevent the unjust enrichment of Defendants.

**107.** By virtue of the ROW Agreements, as well as Defendants' use of the property for which there are no ROW Agreements, Defendants have the beneficial use and enjoyment of Representative Plaintiffs' and Class Members' property for the transmission and distribution of electric power and have knowingly and voluntarily accepted, retained, and used such benefits.

**108.** Defendants' confidential and special business relationships with Representative Plaintiffs and Class Members arose naturally through their

36

rights to use the ROW Agreement and non-ROW Agreement lands, which must co-exist with Representative Plaintiffs' and Class Members' property. To lawfully co-exist, a relationship of trust and confidence developed between the parties, which was cultivated further through the fullness of time by Defendants assuming the role of a fiduciary to maintain the ROW Agreement lands and non-ROW Agreement lands, prevent waste, and honor their commitment to only use such lands for their intended purposes.

**109.** Defendants' unlawful actions are either born out of an abuse of their close fiduciary relationship with Representative Plaintiffs and Class Members or, in the alternative, a serious mistake regarding the interpretation of their right to use such lands under the ROW Agreements and otherwise.

**110.** Despite the ROW Agreements between the parties detailing the specific permissible use of Representative Plaintiffs' and Class Members' property, and Representative Plaintiffs' and Class Members' reliance thereon, Defendants' actions and use of Representative Plaintiffs' and Class Members' property far exceeds the rights granted to Defendants.

**111.** Defendants have been unjustly enriched by, *inter alia*, the (i) as yet unpaid compensation owed to Representative Plaintiffs and Class Members for the use of their land for General Broadband Communications, (ii) revenues and profits generated (and to be generated) by using Representative Plaintiffs' and Class Members' land for General Broadband Communications, and (iii) the return on investment generated by the amounts described in (i) and (ii) above.

37

By utilizing Representative Plaintiffs' and Class Members' property rights under the unlawful circumstances detailed herein, Defendants are trustees for Representative Plaintiffs and Class Members who are suffering by reason of Defendants' wrongful actions. These unauthorized expanded benefits amount to the transfer and unlawful acquisition of Representative Plaintiffs' and Class Members' property and an abuse of the relationship between the parties. As such, Defendants are not entitled to have, hold, and enjoy such rights and benefits.

**112.** Accordingly, Representative Plaintiffs, for their benefit and the benefit of the Class Members, seek to impose a constructive trust over all amounts by which Defendants have been (and will be) unjustly enriched.

**COUNT II**
**UNJUST ENRICHMENT**

**113.** The preceding factual statements and allegations contained in paragraphs 1 through 104 are incorporated by reference.

**114.** This also is an action seeking an award of damages to Representative Plaintiffs and Class Members arising out of the unjust enrichment of Defendants through their wrongful use of Representative Plaintiffs' and Class Members' property.

**115.** By virtue of the ROW Agreements, as well as Defendants' use of the property for which there are no ROW Agreements, Defendants have knowledge of the benefits conferred upon them to use and enjoy Representative Plaintiffs'

and Class Members' property for the transmission and distribution of electric power. Defendants have knowingly and voluntarily accepted, retained, and used such benefits.

**116.** An additional and substantial benefit not contemplated by the ROW Agreements and/or Defendants' use of the property for which there are no ROW Agreements has flowed to Defendants by their unlawful actions described herein. Among other things, Defendants have been unjustly enriched by the (i) as yet unpaid compensation owed to Representative Plaintiffs and Class Members for the use of their land for General Broadband Communications, (ii) revenues generated (and to be generated) by using Representative Plaintiffs' and Class Members' land for General Broadband Communications, and (iii) the return on investment generated by the amounts described in (i) and (ii) above.

**117.** Defendants have not compensated Representative Plaintiffs and Class Members for this benefit wrongfully taken from them, nor do Defendants have any express contract that allows them to install fiber optic cable or other non-electric power related communication systems under, over, and/or in the easements encumbering Representative Plaintiffs' and Class Members' land.

**118.** Considering the unauthorized financial benefits that have flowed (and continue to flow) to Defendants, the instant circumstances are such that it would be inequitable for Defendants to retain the benefit taken from Representative Plaintiffs and Class Members without paying them for the

39

privilege. Accordingly, Representative Plaintiffs, for their benefit and the benefit of the Class Members, seek to recover all amounts by which Defendants have been unjustly enriched.

### COUNT III
### UNLAWFUL DETAINER

**119.** The preceding factual statements and allegations contained in paragraphs 1 through 104 are incorporated herein by reference.

**120.** Defendants' entry upon and use of the land owned by Representative Plaintiffs and Class Members without their consent for the placement of fiber optic communication facilities and/or other unauthorized communications facilities for General Broadband Communications constitute "unlawful entry" and "unlawful detention" pursuant to section 82.02, Fla. Stat. (2022).

**121.** Defendants' original entry onto Representative Plaintiffs' and Class Members' ROW Agreement lands and non-ROW Agreement lands was lawful and of right, but the instant Defendants engaged in the construction and operation of fiber optic and other communications systems for General Broadband Communications, Defendants' right to the possession of Representative Plaintiffs' and Class Members' land expired and became a wrongful withholding of possession.

**122.** Defendants' use of their fiber optic and wireless systems for General Broadband Communications amounts to an ouster of Representative

40

Plaintiffs and Class Members from using their property in the same manner as a residuary right.

**123.** Defendants have refused to stop engaging in the commercial leasing, licensing, or conveying of their various communications systems for General Broadband Communications, and likewise have refused to stop the alleged unlawful activity on Representative Plaintiffs' and Class Members' lands.

**124.** Representative Plaintiffs and Class Members have been, and continue to be, deprived of their full possessory rights in their servient estates by Defendants' unlawful entry upon their subject lands, and are entitled to summary relief and a judgment for possession and damages pursuant to Sections 82.071 and 82.091, *Fla. Stat. (2022)*, consisting, at a minimum, of double the reasonable rental value.

### COUNT IV
### INJUNCTION

**125.** The preceding factual statements and allegations contained in paragraphs 1 through 104 are incorporated herein by reference.

**126.** This also is an action for issuance of an injunction.

**127.** Under Florida law, and pursuant to the above-described allegations, Representative Plaintiffs have a substantial likelihood of success in this matter because Defendants are unlawfully using the ROW Agreement

lands and non-ROW Agreement lands owned by Representative Plaintiffs and Class Members land for General Broadband Communications.

**128.** Unless Defendants' above-described fiber leasing, licensing, and/or conveying activities are required to cease or, alternatively, required to be conducted only after obtaining and paying for the proper easement rights, Representative Plaintiffs and Class Members will continue to suffer irreparable harm.

**129.** Representative Plaintiffs and Class Members will also suffer irreparable harm unless Defendants are temporarily enjoined from all communications with the putative Class Members concerning all issues in this case including, but not limited to, the surreptitious solicitation of proper communication easements or ROW agreements pending the Court's ruling on certification of the putative class.

**130.** Failure to issue this temporary injunction will lead to the following problems, among others:

(i)    Class Members will be placed in the position of making decisions without knowledge of the circumstances of this proceeding, and without full knowledge of their full legal rights; and,

(ii)   The inconsistent actions of certain Class Members likely would create other court actions that might lead to incompatible remedies and wasted court resources.

**131.** Representative Plaintiffs and Class Members have no adequate remedy at law relative to Defendants' ongoing and above-described wrongful activities, and potential wrongful activities.

42

**132.** Enjoining Defendants from conducting and/or allowing the transmission of communications other than their electricity-related internal communications over Representative Plaintiffs' and Class Members' property will not harm Defendants as much as unlawfully continuing to transmit General Broadband Communications will harm Representative Plaintiffs and Class Members because Defendants transmitted their necessary internal communications over telephone lines long before the installation of any fiber optic cables or wireless communications apparatuses in, over, under and/or across Representative Plaintiffs' and Class Members' property.

**133.** Representative Plaintiffs and Class Members seek the imposition of an injunction against Defendants and all other third parties unlawfully engaging in General Broadband Communications on their property, requiring Defendants and such parties to immediately terminate such activities unless and until adequate ROW Agreement are agreed to, paid for, and approved by the Court. Such an injunction will not disserve, but, in fact, promote the public interest.

## COUNT V
## DECLARATORY JUDGMENT

**134.** The preceding factual statements and allegations contained in paragraphs 1 through 104 are incorporated herein by reference.

**135.** This also is an action for declaratory judgment pursuant to Chapter 86, *Fla. Stat. (2002)*.

43

**136.** Based on the allegations set forth herein, there exists a case of actual controversy within the purview of Chapter 86, *Florida Statutes*, which should be resolved by this Court exercising its declaratory judgment jurisdiction. Because of Defendants' above wrongful actions and inaction, there exists a bona fide, present, and practical need for a judicial declaration establishing the rights and duties of the parties pursuant to the clear language of the ROW Agreements and Defendants' use of Representative Plaintiffs' and Class Members' property where such agreements do not exist.

**137.** The preceding factual allegations demonstrate that there is a substantial controversy between parties having adverse legal interests, which are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**138.** A declaratory judgment will establish the clear legal position of the parties, as well as clarify the legal relationships at issue. Defendants' above-described wrongful actions and inaction create a doubt about the legal authority of Defendants' activities on Representative Plaintiffs' and Class Members' ROW Agreement lands under the clear language of the ROW Agreements, as well as on Representative Plaintiffs' and Class Members' non-ROW Agreement lands, which require resolution by way of declaratory judgment.

**139.** The following critical question requires resolution by declaratory judgment: "Whether Defendants own and control easements over

44

Representative Plaintiffs' and Class Members'·land that permit Defendants (or their assigns) to use such easements for the transmission of General Broadband Communications via wires, fiber optic cables, and/or wireless telecommunications apparatuses constructed under, over and/or in Representative Plaintiffs' and Class Members' property?"

**COUNT VI**
**TRESPASS**

**140.** The preceding factual statements and allegations contained in paragraphs 1 through 104 are incorporated herein by reference.

**141.** Defendants entered Representative Plaintiffs' and Class Members' property, without legal authority to do so, to construct and operate various communications systems for the purpose of transmitting General Broadband Communications. Such entry was unlawful and without right. Defendants' wrongful conduct constitutes a wrongful entry upon the land owned by Representative Plaintiffs and Class Members without justification or authority, in violation of Florida law. Defendants' wrongful conduct has deprived (and will continue to deprive) Representative Plaintiffs and Class Members of their property, property rights, and money they should have received for the use of their property to transmit General Broadband Communications.

**142.** At all relevant times, Representative Plaintiffs and Class Members have had clear title to and possession of their properties. Representative Plaintiffs and Class Members never authorized Defendants' unlawful invasions described herein. In fact, Defendants never informed Representative Plaintiffs

45

and Class Members about their various communication networks or otherwise paid them fair market value for the privilege of constructing, operating, maintaining, marketing, selling and/or leasing such communication networks for General Broadband Communications. Defendants' wrongful actions and inaction constitute (and continue to constitute) a trespass upon Representative Plaintiffs' and Class Members' property in disregard of their property rights.

**143.** Defendants' wrongful sale, lease, or license of the easements otherwise allowed usage of their various communications networks constructed under, over and/or in the easements over the land owned by Representative Plaintiffs and Class Members for General Broadband Communications (i) impose upon the easements an unlimited General Broadband Communications business not remotely encompassed by the terms of the ROW Agreements, (ii) impose upon Representative Plaintiffs' and Class Members' land not covered by ROA Agreements an unlimited General Broadband Communications business not remotely contemplated and/or intended by the parties, and (iii) collectively constitute a trespass upon the absolute legal rights of Representative Plaintiffs and Class Members to all rights and interests in and to the lands not granted to Defendants in the ROW Agreements and/or the ownership and use of their property not encumbered by ROA Agreements.

**144.** As a direct and proximate result of Defendants' past, present, and continued trespasses, Representative Plaintiffs and Class Members have

46

suffered (and will continue to suffer) injury to their property, property rights, and finances in the form of, *inter alia*:

(i)     For such lands for which ROW Agreements exist, the fair market value of the right to construct, operate, maintain, market, use, sell and/or lease the SVEC right-of-way for purposes other than transmitting and distributing electricity and their electricity-related internal communications, including General Broadband Communications;

(ii) For such lands for which ROW Agreements do not exist, the fair market of the right to construct, operate, maintain, market, use, sell and/or lease the SVEC right-of-way for purposes other than transmitting and distributing electricity and their electricity-related internal communications, including General Broadband Communications;

(iii) A physical burden on Representative Plaintiffs' and Class Members' land in the form of Defendants' various communications networks for General Broadband Communications, including the resulting entry on Representative Plaintiffs' and Class Members' land to construct, repair and maintain such networks, and

(iv) A legal burden on Representative Plaintiffs' and Class Members' land in the form of prescriptive easement rights that could be mandatorily expanded into other communications corridors.

## RELIEF REQUESTED

**145.** The preceding factual statements and allegations contained in paragraphs 1 through 144 are incorporated by reference.

**146. ACTUAL, CONSEQUENTIAL, COMPENSATORY, AND ECONOMIC DAMAGES AND/OR EQUITABLE RELIEF.** As a direct and proximate result of Defendants' above-described wrongful actions, inaction, cover-up, deception, concealment, and conspiracy of silence, Representative Plaintiffs and Class Members have suffered (and will continue to suffer) the above-described actual and consequential injury, harm, compensatory, and economic damages—for which

47

Representative Plaintiffs and Class Members are entitled to monetary compensation in the form of, *inter alia*: (i) for such lands for which ROW Agreements exist, the fair market value of the right to construct and operate the Network for the transmission of General Broadband Communications, (ii) for such lands for which ROW Agreements do not exist, the fair market value of the right to construct and operate the Network for the transmission of General Broadband Communications, and (iii) the revenues and other amounts by which Defendants have been unjustly enriched by unlawfully using Representative Plaintiffs' and Class Members' property for the transmission of General Broadband Communications (including a full accounting and a factor for the time value of money or Defendants' return on investment). Alternatively, as to prior damages, Representative Plaintiffs and Class Members are entitled to equitable relief in the form of the disgorgement of Defendants' revenues to date from the transmission of General Broadband Communications and/or restitution in the form of the fair market rental value of Representative Plaintiffs' and Class Members' land from the inception of Defendants' transmission of General Broadband Communications to date. All damages, injury, and harm suffered (and to be suffered) by Representative Plaintiffs and Class Members were reasonably foreseeable by Defendants and exceed the minimum jurisdictional limits of this Court. All conditions precedent to Representative Plaintiffs' and Class Members' claims for relief have been performed or occurred.

147. **DECLARATORY RELIEF.** Representative Plaintiffs and Class Members also are entitled to the declaratory relief set forth above, including, without limitation, a declaration that as a matter of law, Defendants do not own and/or control easements over Representative Plaintiffs' and Class Members' land and/or any rights permitting Defendants (or their assigns) to transmit General Broadband Communications via wires, fiber optic cables, and/or wireless telecommunications apparatuses constructed under, over and/or in Representative Plaintiffs' and Class Members' property. All conditions precedent to Representative Plaintiffs' and Class Members' claims for relief have been performed or occurred.

148. **INJUNCTIVE RELIEF.** Representative Plaintiffs and Class Members also are entitled to the injunctive relief set forth above, including, without limitation, immediately enjoining Defendants and all other third parties from transmitting General Broadband Communications (and all related activities) over Representative Plaintiffs' and Class Members' property unless and until adequate ROW Agreements permitting such communications are agreed to, paid for, and approved by the Court. All conditions precedent to Representative Plaintiffs' and Class Members' claims for relief have been performed or occurred.

149. **ATTORNEYS' FEES, LITIGATION EXPENSES, AND COURT COSTS.** Representative Plaintiffs and Class Members also are entitled to recover their attorneys' fees, litigation expenses, and court costs. All conditions precedent to Representative Plaintiffs' and Class Members' claims for attorneys' fees, litigation

expenses, and court costs have been performed or occurred.

**WHEREFORE,** Representative Plaintiffs, for themselves and Class Members, respectfully request that (i) Defendants be cited to appear and answer this lawsuit, (ii) this action be certified as a class action, (iii) Representative Plaintiffs be designated the Class Representatives, and (iv) Representative Plaintiffs' counsel be appointed Class Counsel. Representative Plaintiffs, for themselves and Class Members, also request that upon final trial or hearing, judgment be awarded against Defendants in their favor for:

(i)     actual, consequential, compensatory, and economic damages to be determined by the trier of fact;

(ii)    all amounts by which Defendants have been unjustly enriched;

(iii)   an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including the imposition of a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;

(iv)    a factor for the time value of money (or Defendants' return on investment);

(v)     declaratory relief as set forth above;

(vi)    injunctive relief as set forth above;

(vii)   reasonable and necessary attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;

(viii)  costs of suit; and

(ix)    such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Representative Plaintiffs, for themselves and Class Members, respectfully demand a trial by jury of all issues so triable.

Respectfully submitted this 17th day of September, 2024.

**AVERA & SMITH, LLP**

/s/ Rod Smith
ROD SMITH, ESQ.
Florida Bar No. 0202551
MARK A. AVERA, ESQ.
Florida Bar No. 0812935
2814 SW 13th Street
Gainesville, FL 32608
Telephone: 352-372-9999
Facsimile:  352-375-2526
Email: rodsmith@avera.com
Email: rsservice@avera.com
Email: mavera@avera.com
Email: maservice@avera.com

**THE COFFMAN LAW FIRM**

/s/ Richard L. Coffman
RICHARD L. COFFMAN, ESQ.
3355 West Alabama, Suite 240
Houston, Texas 77098
Telephone: 713-528-6700
Email: rcoffman@coffmanlawfirm.com
Email: jhoffert@coffmanlawfirm.com

and

**PREVATT LAW FIRM, PL**

/s/ James W. Prevatt, Jr.
JAMES W. PREVATT, JR., ESQ.
Florida Bar No.  0352012
120 East Howard Street
Live Oak, Florida 32064
Telephone: 386-362-7979
Email: jprevatt@windstream.net
          jeanieleehegenauer@windstream.net

**ATTORNEYS FOR THE REPRESENTATIVE
PLAINTIFFS AND PUTATIVE CLASS**

51

# Suwannee Valley Electric Cooperative to Build Fiber-Optic Network, Offer Fiber-to-the-Home High-Speed Internet

Press Release

## FOR IMMEDIATE RELEASE

Contact: Jon Little, Director of Communications
(386) 330-5662 (office), (970) 413-4112 (mobile)

Suwannee Valley Electric Cooperative to Build Fiber-Optic Network, Offer Fiber-to-the-Home High-Speed Internet LIVE OAK, Fla., July 26, 2022 – Suwannee Valley Electric Cooperative (SVEC) has announced its plan to build a fiber-optic network across the co-op's service territory. The network will be utilized by SVEC to expand its electric smart grid/self-healing capabilities which will enhance the flow of data used to detect faults and control electrical devices throughout the grid, yielding shorter power outage response times and greater operational efficiency. It will also increase electric system security, reliability, and resiliency.

The fiber network will also be used to deliver 100% fiber to the home (FTTH) high-speed internet service to SVEC's consumer-members through the cooperative's newly formed subsidiary, Rapid Fiber Internet, LLC.

The project, which is expected to take up to 4 years to complete and cost up to $93 million, will span over 4,100 miles of line to deliver high-speed fiber internet services to homes, farms and businesses across Florida's Hamilton, Lafayette, and Suwannee counties, and northern Columbia County. The goal is to ultimately extend fiber internet access to all SVEC consumer-members, if possible. Construction is expected to begin in the 2nd quarter of 2023, with the first internet customers anticipated to be connected in the 3rd quarter of 2023.

EXHIBIT "A"

Rapid Fiber Internet will offer consumers access to symmetrical speeds (same upload and download) of up to 2 gigabits per second.

"In 1937, residents and community leaders banded together to create Suwannee Valley Electric Cooperative to bring reliable and affordable electricity to the people of the Suwannee Valley when existing utilities would not," said SVEC CEO Mike McWaters. "Today, like many other parts of rural America, our area finds itself on the wrong side of a "digital divide," being underserved or unserved by internet providers. In the same spirit as before, the cooperative once again endeavors to provide for a vital unmet need in our community."

SVEC has selected rural fiber-optic network design and construction management leader, Conexon, to deliver comprehensive services including network design, construction project management, engineering, and operations support for the cooperative's FTTH project.

"We are excited to work closely with a trusted partner like Conexon to bring high-speed internet services to our part of rural Florida," said McWaters. "Conexon brings expertise and years of experience in fiber to the home systems for cooperatives across the country, and we are confident that together, we will achieve great results for our community, ushering in a new era of innovation and opportunity."

"At Conexon, we believe that access to high-speed internet is an educational and economic equalizer for rural communities. We're proud to partner with organizations like Suwannee Valley Electric Cooperative that are committed to improving the lives and communities of those they serve through world-class broadband services," said Randy Klindt, Conexon Founding Partner. "It represents a tremendous commitment from the cooperative that will benefit consumers for generations to come."

**Suwannee Valley Electric Cooperative**
Suwannee Valley Electric Cooperative (SVEC) was founded in 1937 in northern Florida. After planning and construction, this member-owned cooperative energized its first electric line in 1940. Since the beginning, SVEC has worked tirelessly to bring safe, affordable, and reliable electricity to its rural communities. Today, SVEC maintains over 4,100 miles of power lines and serves more than 28,000 consumers in Florida's Columbia, Hamilton, Lafayette and Suwannee counties. Visit the Suwannee Valley Electric Cooperative website.

**Conexon**

Conexon works with Rural Electric Cooperatives to bring fiber to the home in rural communities. The company is comprised of professionals who have worked in electric cooperatives and the telecommunications industry, and offer decades of individual experience in business planning, building networks, marketing and selling telecommunications. Conexon offers its electric cooperative clients end-to-end broadband deployment and operations support, from a project's conception all the way through to its long-term sustainability. It works with clients to analyze economic feasibility, secure financing, design the network, manage construction, provide operational support, optimize business performance, and determine optimal partnerships. To date, Conexon has assisted more than 275 electric cooperatives, 60 of which are deploying fiber networks, with more than 500,000 rural Americans connected to fiber to the home. The company has secured nearly $2 billion in federal, state and local grants and subsidies for its clients. Visit the Conexon website.

###

  

Suwannee Valley Electric Cooperative

## Smart Grid & Fiber to the Home Project FAQ

### Project Overview

**What is Suwanee Valley Electric Cooperative building?**
Suwannee Valley Electric Cooperative (SVEC) is working with Conexon, a leader in rural broadband construction, to build a 100% fiber to the home (FTTH) network across SVEC's service territory. This network will be utilized by SVEC to expand its electric smart grid/self-healing capabilities. Specifically, it will enhance the flow of data used to detect faults and control electrical devices throughout the grid, yielding shorter power outage response times and greater operational efficiency. It will also increase electric system security, reliability, and resiliency.

The fiber network will also be used to deliver fiber to the FTTH high-speed internet service to SVEC's consumer-members through the co-op's newly formed subsidiary Rapid Fiber Internet, LLC.

**Why is SVEC/Rapid Fiber Internet offering high-speed fiber internet service?**
Our communities have long suffered from a lack of access to the same speeds and capabilities as those in less rural areas. Rapid Fiber Internet's new service will help close the "digital divide" between those who have access to advanced technology and those who don't. A few of the many benefits of fiber internet access are:

- Access to invaluable educational resources and opportunities for students of all ages
- Access to telemedicine, which can provide high-quality healthcare and treatment without the added cost and hassle of transportation
- The ability for communities to maintain and expand business opportunities and stimulate job growth
- Work-from-home interoffice connectivity and videoconferencing capabilities
- Enhanced experiences with online entertainment services

### Project and Service Details

**Where will high-speed internet be available?**
The goal is to ultimately make high-speed fiber internet available to all SVEC consumer-members throughout Hamilton, Lafayette, and Suwannee counties, and northern Columbia County. Service may be offered to non-SVEC members in the future, but the priority is on serving SVEC members first.

**How will you decide who gets service first?**
The fiber-optic network will follow the path of our electric footprint, with a goal of ensuring the most efficient and logical design and construction process. This efficiency will allow us to offer service at an affordable price for consumers. Among the factors considered as we determine the construction path and schedule:
- Poles and infrastructure "health": How much work may need to be completed to accommodate the fiber

## EXHIBIT "B"

- Population density: More densely populated areas where many people take service help offset the high costs of serving sparsely populated areas
- Internet options: If the community is unserved, underserved or has other internet options
- The terrain where construction must happen

Once these and other factors are understood and weighed, the final design and build schedule will be determined.

### What is the process of building a fiber to the-home (FTTH) network?
Building an FTTH network is a multi-year project encompassing numerous steps and efforts. The network will be built in zones or phases. Each phase can take approximately 12 to 18 months from construction start to customer installation. SVEC and Rapid Fiber Internet will keep consumers updated as the project progresses.

### How will I know which phase or zone I'm in?
Once the schedule is finalized, SVEC and Rapid Fiber will communicate that information.

### When will construction on the network start? How long will it take to complete?
The initial network design, construction plans, and schedule are currently being determined, construction is expected to begin in the 2nd quarter of 2023, with the first customers anticipated to be connected in the third quarter of 2023.

### Who will be the Internet Service Provider (ISP)?
SVEC's newly formed subsidiary, Rapid Fiber Internet, will be the internet service provider, offering high-speed internet service to SVEC consumer-members. Internet customers will receive separate communications, billing, and support from Rapid Fiber Internet, and when customers call Rapid Fiber Internet for customer service, they will speak with trained representatives who understand internet service.

### What Internet packages will be available and what will it cost?
Customers will be able to choose a package that fits their speed needs and budget. Speeds will range from 100 Megabits to 2 Gigabits and although actual prices have not been determined, costs will likely be between $50 and $100 per month.

### Will there be data caps?
No. With fiber internet from Rapid Fiber Internet, there will be no data caps or throttling.

### How can I sign up for service?
Initially, SVEC consumer-members will be able to indicate their interest in obtaining service by submitting an online form at rapid-fiber.com. SVEC and Rapid Fiber Internet will communicate when the time comes to formally sign up for service.

### Will I pay my internet bill along with my electric bill?
No. Internet Services will be billed separately through Rapid Fiber.

### Will my electric bill increase to pay for the fiber to the home (FTTH) network?
No. This will not increase your electricity costs.

### Will local people be hired to help with the fiber installation?
Once an installation contractor is selected, the contractor will likely bring in some of their own personnel to start. Sometime after that, they will likely hire locally, and train workers as needed.

## The Technology

**What is a Fiber-to-the-home network?**
Fiber-optic cables are made up of tiny strands of glass that carry data using light waves, resulting in optimum internet speeds and reliability. Most internet providers use some fiber in their systems but use copper lines for the final connections to the home, resulting in slower speeds. We believe 100 percent FTTH is the best, most sustainable communications choice. With FTTH service, customers will enjoy "symmetrical" speeds, i.e., the same high speeds whether uploading or downloading. A fiber-optic network can carry an extremely high amount of data and is more reliable than other networks because it's less susceptible to interference and damage from lightning and other acts of nature.

**Why is the Rapid Fiber Internet, powered by Suwannee Valley Electric Cooperative, network different from other internet services?**
SVEC's partner Conexon builds only 100 percent *fiber to the home (FTTH)* networks. Others may tout fiber networks, but in many cases that fiber stops at the street and continues with copper lines for the final connections to the home, resulting in slower speeds. Fiber to the home brings an exceptional level of reliability and speed.

## The Installation Process

Once a customer signs up for service, fiber installation is simple: Rapid Fiber Internet will pull fiber along SVEC's power lines and attach the fiber to the home or business. The fiber will run in the same manner as the power lines. If electric service comes from overhead lines, so will the fiber. If your service comes from underground lines, so will the fiber. Next, the fiber line will be attached to a box near the electric meter where the inside wiring connects with the outside wiring. Finally, the fiber is connected to a fiber jack inside the home or business, where it's plugged into the modem Rapid Fiber Internet will provide.

Once outside installation is complete, a representative from Rapid Fiber Internet will contact the customer to schedule an appointment for an in-home installer to finalize the connection and test the service. Once that is completed, service should be ready to go.



# SERVICE AGREEMENT
*Effective August 11, 2023*

This Service Agreement describes certain terms and conditions under which fiber optic communication services, including but not limited to high-speed internet service and VoIP phone service (optional), as applicable, (individually and collectively "Service" or "Services") will be provided by Rapid Fiber Internet, LLC ("Rapid Fiber") to an individual or entity ("Customer"). Rapid Fiber and the Customer will be collectively referred to as "Parties" and independently as "Party."

**COVERED SERVICES.** This Service Agreement outlines what Rapid Fiber is providing to the Customer and the associated obligations of both Parties. All documents incorporated or referenced herein, as each may be amended from time to time, including without limitation Company's Privacy Policy, Acceptable Use Policy, Internet Transparency Policy, and Copyright Infringement Policy, as well as Rapid Fiber's Service and Product Fee Schedule, service guides, and posted policies and procedures, if applicable, constitute the "Terms of Service." Current versions of these documents may be viewed at any time online at www.rapid-fiber.com/legal.

By activating the Services, using the Services, continuing to use the Services after Rapid Fiber provides notice of a change to any Terms and Conditions, or otherwise indicating acceptance of the Services, Customer agrees that Customer has read, understands, acknowledges, and agrees to be bound by this Service Agreement and Rapid Fiber's Terms and Conditions. **If you do not agree, do not use the Services.**

**CUSTOMER ELIGIBILITY.** Individual customers represent and warrant that they are at least 18 years of age and capable of entering into a legally binding agreement on behalf of themselves and others in their residence who may use the Services. If a Customer is not an individual but is a corporate or organized entity, the individual representative who applied for Service represents and warrants that he or she has full legal authority to act on behalf of the Customer.

Additionally, the Customer represents that he, she, or they lawfully own the real property at which the Customer is to receive Service ("Service Location") or that the Customer has written permission from the owner(s) to enter into this Agreement.

**BILLING AND PAYMENT.** The Customer agrees to pay for all Services provided by Rapid Fiber including, but not limited to, charges for installation, Services, and Equipment. In addition to Rapid Fiber's rates and charges, which can be found in Rapid Fiber's Service and Fee Schedule (located on its website: www.rapid-fiber.com), the Customer shall be responsible for payment of all local, state, and federal taxes, fees, and surcharges, however designated, imposed on or based upon the provision, sale, or

EXHIBIT "C"

use of the Services and Equipment. The Customer agrees to pay all monthly charges in advance. The Customer recognizes that Rapid Fiber will not accept partial payments.

**CUSTOMER PORTAL, PAPERLESS BILLING, AUTOPAY, AND AUTHORIZED USER(S).** Customers should complete the Customer Portal registration process as soon as prompted. Upon registering for the Customer Portal, Customers are automatically enrolled in Rapid Fiber's paperless billing program. As such, Customers' monthly bill will be available only via the Customer Portal. Additionally, Customers are encouraged to use the Autopay program to ensure regular and timely delivery of monthly payments. Customers can sign up for Autopay in the Customer Portal.

Customers may request a paper bill be mailed to their address by contacting Rapid Fiber during normal business hours or by making this election in the Customer Portal. However, Customers who request a paper bill or fail to enroll in Autopay will be charged $5 per month for every month they receive a paper bill and do not utilize Autopay.

Customers may add Authorized User(s) to their Rapid Fiber account via the Customer Portal. By designating an individual to be an Authorized User, the Customer is giving that designated individual the authority that he or she possesses as a Customer. For example, an Authorized User may, but is not limited to, make changes to the Rapid Fiber account; may cancel, upgrade, or change Service and/or Equipment; and may speak with Rapid Fiber employees regarding the Service and/or Equipment. The Customer, as the Party to this Agreement and Rapid Fiber's Terms and Conditions, remains responsible and liable for any action of an Authorized User.

**PAYMENT SCHEDULE, LATE CHARGES, CONSEQUENCE OF NON-PAYMENT, AND FINAL BILL.** The Customer agrees that failure to pay all rates, fees, and charges may result in termination of Service and Rapid Fiber's immediate collection of all amounts owed. To avoid termination of Service, the Customer agrees to timely submit all payments to Rapid Fiber.

Rapid Fiber utilizes advance billing. Therefore, the Customer's bill will be generated on the first day of each month, will cover the period from the first day through the last day of the month, and will have a due date of the 10th day of the same month. A late payment fee[1] (see Rapid Fiber's Service and Product Fee Schedule) will be assessed if the account is not paid in full by the due date, which is always the 10th day of the same month. Accounts not paid in full before the 20th of the current month will be suspended, which will result in the Services being disconnected (this suspension excludes E-911 services). The account must be made current before Services will be reconnected. Suspension of Service will not result in proration of billing for the time Service was not available.

---

[1] Any Late Fee imposed is a reasonable estimate of costs to manage past due accounts, including preparing additional bill statements, processing Customer service records, mailing additional notices, tracking past due accounts, responding to inquiries regarding past due balances, making collection telephone calls, performing special procedures to process past due payments, generating work orders, and performing necessary field work to collect past due accounts.

Accounts not made current by the 28th of the same month will be deactivated (this excludes E-911 services), which means the service remains disconnected and to reactivate service, the Customer must pay all outstanding charges and fees, including a Reconnect Fee, and contact the Rapid Fiber Customer Experience team. Additionally, the Customer's Services (including E-911 services) will be cancelled at this time, and the Customer will be final billed for all unpaid charges and fees. The return of all Rapid Fiber Equipment is due within 30 days of this cancellation. If Equipment is not returned, Customer will receive an updated final bill that includes all unreturned Equipment charges.

**For Affordable Connectivity Program (ACP) Recipients:** Rapid Fiber will comply with all ACP requirements, including the Consumer protection requirements related to non-payment. If the Customer is an ACP recipient, the Customer should review all requirements and rules related to the ACP program to understand how non-payment will impact his or her Rapid Fiber account and Services.

If the Customer's check is returned for insufficient funds or other payment method attempts fail, Rapid Fiber may impose a returned-check or payment failure fee, as set forth in Rapid Fiber's Service and Product Fee Schedule. Rapid Fiber, at its sole discretion, may waive or forgive payment failure fees (e.g., when the credit card on record for an account enrolled in Autopay expires). However, Rapid Fiber will generally not waive or forgive more than one payment failure fee in any 12-month period.

**COLLECTIONS.** Rapid Fiber may use a third-party agent to collect unpaid balances from Customers. As such, the Customer gives express written consent, by agreement to this Service Agreement, to be contacted by direct mail, email, text message, or telephone call, including wireless telephone numbers, associated with the account. Methods of contact may include prerecorded or artificial voice messages and/or use of an automatic dialing device, as applicable. Collection fees, if any, will be applied to the account subject to collection. Rapid Fiber reserves the right to use any and all information regarding the Customer's account(s) in the collection process.

**TERM OF AGREEMENT AND TERMINATION BY CUSTOMER.**
**Residential and Business Basic Customers.** This Agreement is for no fixed term, and the Customer can cancel Service at any time. The Customer may terminate Service in any of the following ways: (1) in person at Rapid Fiber's office during normal business hours, (2) calling our Customer Experience team during normal business hours, or (3) through the Customer Portal. The Router/Gateway, wireless extender(s), if any, and Optical Network Terminal ("ONT") on the Customer's premises remain the property of Rapid Fiber and must be returned to Rapid Fiber at Rapid Fiber's office upon cancellation or discontinuation of Service. It is the Customer's responsibility to return the equipment to Rapid Fiber. A technician will not be sent to retrieve equipment when a Customer terminates Service. Failure to return the equipment within 30 days of cancellation or discontinuation of Service will result in the Customer being billed for the value of the unreturned equipment. It is the Customer's responsibility to provide a forwarding address for final billing purposes.

***Business Plus and Business Premium Customers.*** Unless an agreement is negotiated between the Customer and Rapid Fiber and it is set out in an agreement endorsed by both parties, there is no fixed term, and the Customer can cancel Service at any time. Unless provided otherwise in a separate agreement between the parties, the Customer may terminate Service in any of the following ways: (1) in person at Rapid Fiber's office during normal business hours, (2) calling our Customer Experience team during normal business hours, or (3) through the Customer Portal. All equipment installed by Rapid Fiber, including but not limited to the Router/Gateway, wireless extender(s), if any, and Optical Network Terminal ("ONT"), remain the property of Rapid Fiber and must be returned to Rapid Fiber at Rapid Fiber's office upon cancellation or discontinuation of Service unless the separately negotiated agreement provides otherwise. Failure to return the equipment within 30 days of cancellation or discontinuation of Service will result in the Customer being billed for the value of the unreturned equipment. It is the Customer's responsibility to provide a forwarding address for final billing purposes.

***Customers with a Customized Business Plan.*** The term of agreement, if any, will be governed by the Customer's unique service level agreement. That agreement will also set forth whether and how the Customer may cancel Service with Rapid Fiber and what equipment, if any, must be returned to Rapid Fiber upon cancellation or discontinuation of Service. Failure to return the equipment within 30 days of cancellation or discontinuation of Service will result in the Customer being billed for the value of the unreturned equipment. It is the Customer's responsibility to provide a forwarding address for final billing purposes.

**TERMINATION BY RAPID FIBER.** For any other reason and notwithstanding anything else in this Agreement, Rapid Fiber may terminate or decline to provide Service to Customer for any non-discriminatory reason. If appropriate and possible, Rapid Fiber will provide notice of termination of the Service to Customer, which may provide the reason for the disconnection. Should Service be terminated by Rapid Fiber, the Customer shall be responsible for returning equipment within 30 days. Failure to return the equipment within 30 days will result in the Customer being billed for the value of the unreturned equipment. The Customer will be responsible for all fees, costs, and charges until the time the Service is disconnected by Rapid Fiber.

**INSTALLATION PROCESS.** Rapid Fiber will use best practices when installing a fiber service drop to the Customer's service location and when performing the in-premises installation. It shall be the Customer's responsibility to notify Rapid Fiber during the installation process or by contacting Rapid Fiber's Customer Experience team during normal business hours if a desired fiber route is requested or if underground equipment (i.e., sprinklers, underground pet fences, etc.) is installed on the Customer's premises. No one is required to be present for the fiber service drop installation, so prior notification of this step to the Customer by Rapid Fiber will not be provided unless an issue is encountered.

At least one person at least 18 years of age must be present for a Rapid Fiber representative to enter the premises of the service location to provide installation, service, or repairs. If at least one person over 18 years old is not present at the time of installation, the installation appointment will be rescheduled, and the account will be charged a cancellation fee, as set forth in Rapid Fiber's Service and Product Fee Schedule.

Proper installation may require drilling through interior and/or exterior walls in order to run fiber or wire and install outside and in-premises equipment. To facilitate optimal Wi-Fi coverage, additional equipment may be necessary, and additional charges will apply. For large premises or premises that have non-standard configurations or construction, a custom Wi-Fi solution may be required.

**DATA USAGE.** Rapid Fiber has not established a monthly data usage cap for its Customers. However, Rapid Fiber will continuously and routinely monitor usage. Specifically, Rapid Fiber regularly reviews accounts with uncommonly high usage relative to all other accounts to ensure such accounts have not been subjected to cloning, unauthorized access, other security breaches, or unlawful activity. As part of this review, a Rapid Fiber representative may contact account holders to inquire about usage and may take or require actions to correct problems such as security, class of use, or unlawful activity.

**CONSENT TO COMMUNICATIONS FROM RAPID FIBER.** The Customer agrees that Rapid Fiber or third parties acting on Rapid Fiber's behalf may call or text the Customer at any telephone number that the Customer provides to Rapid Fiber or that Rapid Fiber provides to the Customer and may do so for purposes relating to the Customer's account and/or Services to which the Customer subscribes. The Customer expressly consents to receive such calls and texts and agrees that these calls and texts are not unsolicited.

The Customer understands and acknowledges that these calls and texts may entail the use of an automatic telephone dialing system and/or artificial or prerecorded messages. If the Customer does not wish to receive these communications, the Customer must send written notice of the Customer's revocation to legalnotices@rapid-fiber.com. The Customer understands and acknowledges that this is the exclusive means of opting out of such communications. The Customer may not opt-out of receiving certain communications pertaining to the Customer's account, including but not limited to communications regarding emergencies, fraud, or other violations of law, security issues, notices concerning Customer's bill, and harm caused to the network. Message frequency depends on the Customer's activity with the provided Services. Message and/or data rates may apply.

**EQUIPMENT, TAMPERING OR MISUSE OF EQUIPMENT, AND RISK OF LOSS.** All equipment and other property and facilities installed by Rapid Fiber in or on the Customer's premises to deliver the Services to the Customer, including without limitation, Optical Network Terminals (ONT), wireless routers, Wi-Fi extenders, and wiring ("Equipment"), shall remain the sole and exclusive property of Rapid Fiber. In the

event that the Equipment is destroyed, damaged, lost, or stolen, including fire, flooding, storm, or other incident beyond the Customer's control, the Customer shall be liable to Rapid Fiber for the full replacement cost for any lost or damaged Equipment. The Customer agrees to pay any Equipment charges associated with the Service. The Customer is not permitted to alter, misuse, repair, or in any manner tamper with the Equipment or outlets or remove from the Equipment any markings or labels.

Rapid Fiber's Equipment is designed to be used on the premises in which Service is installed. Therefore, the Customer is prohibited from moving Equipment to another location or using it at an address other than the Service address without prior authorization by Rapid Fiber. In the event that the Customer relocates or if the Service is disconnected or terminated for any reason, the Customer must immediately return all in-premises Equipment in the same operating condition as when received or installed at the Customer's premises (reasonable wear and tear excepted) directly to Rapid Fiber, but no later than 30 days following termination of Service. If any Equipment is not returned or is damaged by the Customer at any point during Service, a damaged equipment fee will be assessed to cover the cost of repair or replacement, as set forth in Rapid Fiber's Service and Product Fee Schedule.

**ACCESS TO CUSTOMER PREMISES.** As a condition of receiving the Services, and without compensation, the Customer grants a perpetual easement on and through the service location to provide data and, if applicable, voice services on transport fiber, distribution fiber, and service extension fiber, if applicable, for Service to both the Customer and to other customers, and to perform necessary maintenance, service upgrades, and periodic right-of-way maintenance by or for Rapid Fiber; its parent company Suwannee Valley Electric Cooperative; and at Rapid Fiber's direction, a third party. This easement, in addition to all other rights and privileges afforded by Florida law, explicitly allows Rapid Fiber and its agents the right to enter Customer's property at which the Services and/or Rapid Fiber Equipment will be provided for the purposes of installing, configuring, maintaining, inspecting, upgrading, replacing, and removing the Services and/or Rapid Fiber Equipment used to receive any Services.

**THIRD-PARTY CHARGES THAT ARE CUSTOMER'S RESPONSIBILITY.** The Customer may incur charges with third-party service providers (i.e., accessing online services; calling, texting, or otherwise communicating with parties who charge for such services; and purchasing or subscribing to other offerings via the internet) that are separate and apart from the amounts charged by Rapid Fiber. The Customer is responsible for all such charges payable to third parties, including all applicable taxes.

**MONITORING AND RECORDING.** The Customer agrees that Rapid Fiber and its agents may monitor and record any telephone calls or other voice, data, or image communications that are transmitted between Rapid Fiber and its agents on the one hand and the Customer, his or her authorized user(s), agents, or any permitted users of your Service or Equipment, or any user of any phone number associated with the Customer's account on the other hand.

**UNAUTHORIZED USE OF SERVICE.** The Customer and members of the Customer's household, including guests of the Customer, are the only permitted users of the Service and must comply with all Terms and Conditions. The receipt of Services without authorization is a crime, and it is unlawful to damage, alter, or destroy Rapid Fiber's Equipment. Customer understands that Customer may be subject to both criminal and civil penalties for such conduct. The Customer shall not use the Services in a manner calculated to avoid Rapid Fiber's policies and procedures. The Customer may not sell, transfer, lease, encumber, or assign all or part of the Service. Whether through Rapid Fiber's Equipment or any wired or wireless router or other equipment installed by the Customer, no one outside of the Customer's household may access the Service through the Customer's account. The Customer is responsible for all traffic coming into or outward from the Customer's account, even if it is by or from an unpermitted user. By accepting Service, the Customer warrants that any use of the Service complies with all applicable laws, regulations, and rules, including all of Rapid Fiber's Terms and Conditions. Failure to comply with the Terms and Conditions may result in suspension of Service.

This limitation on permitted uses includes, but is not limited to, hosting applications such as the provision of e-mail, FTP, HTTP, VoIP, and Telnet access. Although resale of such services is prohibited, business plans may allow for the hosting of these services for the business's own purpose (e.g., employee email or a basic business website for marketing). The Customer agrees not to use the Service in a way prohibited by the Terms of Service or by local, state, or federal law, including but not limited to trademark, copyright, or other intellectual property laws. Failure to comply with any applicable laws may result in termination of Service.

**Unlawful Use.** The Customer may use the Service and the Equipment only for lawful purposes. Rapid Fiber reserves the right to immediately disconnect Service without notice, if, in Rapid Fiber's sole and absolute discretion, it is determined that the Customer has used the Service or the Equipment for an unlawful purpose. In the event of such disconnection, the Customer will be responsible for all charges, including, without limitation, unbilled charges, plus a termination fee, if applicable, all of which will become immediately due and payable upon disconnection of Service. If Rapid Fiber believes that Service or the Equipment has been used for an unlawful purpose, Rapid Fiber may forward the relevant communication and other information, including the Customer's identity, to the appropriate authorities for investigation and prosecution. The Customer hereby consents to this forwarding of any such communications and information to these authorities. In addition, Rapid Fiber will provide information in response to law enforcement requests, lawful government requests, subpoenas, and/or court orders to protect its rights and property and in the case where failure to disclose the information may lead to imminent harm to the Customer or others.

**Inappropriate Conduct.** The Customer may not use the Service or the Equipment in any way that is threatening, abusive, harassing, defamatory, libelous, deceptive, fraudulent, invasive of another's privacy, or any similar behavior. Rapid Fiber reserves the right to immediately disconnect the Service without notice, if, in Rapid Fiber's sole

and absolute discretion, it is determined that the Customer has used the Service or the Equipment in any of the aforementioned ways. In the event of such disconnection, the Customer will be responsible for all charges, including, without limitation, unbilled charges, all of which will become immediately due and payable upon disconnection of Service. If Rapid Fiber believes that the Customer used the Service or the Equipment in any of the aforementioned ways, Rapid Fiber may forward the relevant communication and other information, including the Customer's identity, to the appropriate authorities for investigation and prosecution. The Customer hereby consents to this forwarding of any such communications and information to these authorities. In addition, Rapid Fiber will provide information in response to law enforcement requests, subpoenas, and/or court orders to protect its rights and property and in the case where failure to disclose the information may lead to imminent harm to the Customer or others. Furthermore, Rapid Fiber reserves all of its rights at law and equity to proceed against anyone who uses the Service illegally or improperly.

**Tampering.** The Customer may not alter or change the electronic serial number or Equipment identifier of the Equipment to perform a factory reset of the Equipment without Rapid Fiber's prior written consent. Rapid Fiber reserves the right to disconnect Service if, in Rapid Fiber's sole and absolute discretion, Rapid Fiber believes that the Customer tampered with the Equipment. In the event of such disconnection, the Customer will remain responsible for all charges, including, without limitation, unbilled charges, plus a termination fee, if applicable, all of which will immediately become due and payable. The Customer may not attempt to hack or otherwise disrupt the Service or make any use of the Service that is inconsistent with its intended purpose.

**Theft of Service.** The Customer may not use the Service in a manner calculated to avoid Rapid Fiber's policies and procedures. The Customer shall not obtain or use the Service in an improper manner. The Customer must notify Rapid Fiber immediately, in writing or by calling the Customer Experience team, if the Equipment is stolen or if the Customer becomes aware at any time that Service is being stolen, fraudulently used, or otherwise being used in an unauthorized manner. When the Customer calls or writes, the Customer must provide his or her account number and a detailed description of the circumstances of the Equipment theft and/or fraudulent or unauthorized use of Service. Failure to do so in a timely manner may result in the disconnection of Service and additional charges assessed to the Customer's account. Until such time as Rapid Fiber receives notice of the theft and/or fraudulent or unauthorized use, the Customer will be liable for all use of the Service using stolen Equipment and any and all stolen, fraudulent, or unauthorized use of the Service. Rapid Fiber reserves all of its rights at law and equity to proceed against anyone who uses the Service illegally or improperly. The Customer is responsible for implementing appropriate security measures when using the Services, including taking whatever steps are necessary to ensure that data is not accessed by unauthorized third parties. Rapid Fiber is not responsible for any damages to users of the Services that may be caused by unauthorized third parties.

**Violations of Acceptable Use Policy.** Rapid Fiber reserves the right to immediately disconnect Service without notice, if, in Rapid Fiber's sole and absolute discretion, it is

determined that the Customer used the Service or the Equipment in any way that violates Rapid Fiber's Acceptable Use Policy.

**TRANSFER OF ACCOUNT.** The Services shall only be provided at the address where Rapid Fiber completes installation. The Customer may not transfer the Customer's rights or obligation to the Services to any successor tenant or occupant or to any other address.

**CHANGES IN SERVICES, CHARGES, OR TERMS OF SERVICE AND NOTICE TO CUSTOMER.** Rapid Fiber reserves the right to modify this Service Agreement or any of its Terms and Conditions at any time by posting changes online at www.rapid-fiber.com/legal. Rapid Fiber will also send a notice via email to each Customer for which an email address is maintained on file. The Customer's continued use of the Service following notice of such modification shall be deemed to be the Customer's acceptance of any such modification. If the Customer does not agree to any modification of the Terms and Conditions, the Customer must immediately cease using the Service and notify Rapid Fiber that the Customer is terminating the Service.

Additionally, Rapid Fiber may change or eliminate Services, Equipment, rates, and charges. Rapid Fiber will give the Customer 30 days' notice of rate increases or other changes in charges or changes to or elimination of Services. If Rapid Fiber makes such a change, Rapid Fiber will post notice at www.rapid-fiber.com/legal and provide notice to Customers' email addresses.

Because Rapid Fiber may, from time to time, notify Customers about important information regarding the Service and the Terms and Conditions by email, the Customer agrees it is his or her responsibility to regularly check his or her e-mail and all postings at www.rapid-fiber.com/legal and to keep his or her account updated with a valid email address.

**SERVICE AND REPAIRS.** Rapid Fiber will make reasonable efforts to maintain the system and respond to service calls in a timely manner. Rapid Fiber will repair or replace, at Rapid Fiber's sole discretion, Equipment damaged due to reasonable wear and tear or technical malfunction. Physical damage to Equipment caused by intentional or negligent misuse is the Customer's sole responsibility, and the Customer may be charged for the repair or replacement, whichever is warranted.

**PRIOR ACCOUNTS.** The Customer warrants that no monies are owed to Rapid Fiber from previous accounts with Rapid Fiber. If Rapid Fiber finds a prior account for the Customer where money is owed, then Rapid Fiber may apply any funds received to that prior account, where allowed by law.

**WARRANTY DISCLAIMER AND LIMITATION ON DAMAGES.** SERVICE AND EQUIPMENT ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED. RAPID FIBER EXPRESSLY DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OF

TITLE, MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE REGARDING THE RAPID FIBER EQUIPMENT, SOFTWARE, OR ANY SERVICE FURNISHED TO THE CUSTOMER, ALL OF WHICH WARRANTIES ARE EXPRESSLY EXCLUDED. RAPID FIBER DOES NOT WARRANT THAT SERVICE WILL BE UNINTERRUPTED; ERROR FREE; OR FREE OF ANY VIRUSES, WORMS, MALWARE, SPAM, POP-UP ADVERTISING, SPYWARE, ADWARE, DENIAL OF SERVICE ATTACKS OR OTHER HARMFUL COMPONENTS. RAPID FIBER DOES NOT WARRANT THAT ANY DATA OR FILES CUSTOMER SENDS OR RECEIVES VIA THE SERVICE WILL BE TRANSMITTED IN UNCORRUPTED FORM, WITHIN A REASONABLE TIME, OR FREE FROM UNAUTHORIZED ACCESS BY OTHERS OR THAT OTHER USERS WILL BE UNABLE TO GAIN ACCESS TO THE CUSTOMER'S INFORMATION.

*Limitation of Liability.* Rapid Fiber (and its Affiliates, Employees, Officers, Managers, Directors, and Agents) shall not be liable to the Customer for indirect, special, incidental, consequential, punitive, or exemplary damages arising out of or in connection with the Services or any acts or omission associated therewith, including any acts or omissions by subcontractors of Rapid Fiber or relating to any Services furnished, whether such claim is based on breach of warranty, contract, or tort, including negligence or any other legal theory, and regardless of the causes of such loss or damages or whether any other remedy provided herein fails.

*Customer's Exclusive Remedy.* Rapid Fiber's entire liability and the Customer's exclusive remedy with respect to the use of the Services (including without limitation with respect to the installation, delay, provision, termination, maintenance, repair, interruption, or restoration of any such Services) or any breach by Rapid Fiber of any obligation Rapid Fiber may have under the Terms and Conditions whether in an action for or arising out of breach of contract, tort (including negligence), indemnity, or strict liability, shall be the Customer's ability to terminate the Service or to obtain the replacement or repair of any defective Equipment. In no event shall Rapid Fiber's liability to the Customer for any claim arising out of this Agreement exceed the amount paid by the Customer during the preceding 3-month period.

The provisions of this Section constitute an allocation of risk between the parties, and the price charged to the Customer is based on such allocation of risk. The terms of this Section shall survive the termination of this Agreement for any reason.

**CUSTOMER INDEMNIFICATION.** THE CUSTOMER IS RESPONSIBLE FOR AND SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS RAPID FIBER AND ITS EMPLOYEES, AFFILIATES, SUPPLIERS, AGENTS, AND CONTRACTORS AND SHALL REIMBURSE RAPID FIBER FOR ANY DAMAGES, LOSSES, OR EXPENSES (INCLUDING WITHOUT LIMITATION, REASONABLE ATTORNEY'S FEES AND COSTS) INCURRED BY RAPID FIBER IN CONNECTION WITH ANY CLAIMS, SUITS, JUDGMENTS, AND CAUSES OF ACTION ARISING OUT OF (i) CUSTOMER USE OF THE SERVICES OR EQUIPMENT; (ii) VIOLATION OR INFRINGEMENT OF CONTRACTUAL RIGHTS, PRIVACY, CONFIDENTIALITY, COPYRIGHT, PATENT, TRADEMARK, TRADE SECRET, OR OTHER INTELLECTUAL PROPERTY AND

PROPRIETARY RIGHTS ARISING FROM CUSTOMER USE OF THE SERVICES OR ANY UNAUTHORIZED APPARATUS OR SYSTEM; AND (iii) CUSTOMER BREACH OF ANY PROVISION OF THIS AGREEMENT.

**SERVICE INTERRUPTIONS.** Rapid Fiber assumes no liability for interruption of Service beyond its control, including, without limitation, acts of God, natural disaster, fire, civil disturbance, strike, or weather. Any credit adjustments will be determined on a case-by-case basis at Rapid Fiber's sole discretion.

**INTERNET ACCESS SPEEDS AND GUARANTEES.** The internet access speeds quoted are the maximum rates by which downstream internet access data may be transferred between Rapid Fiber facilities and the network interface device at the Customer's premises. The maximum rate is not guaranteed and may vary. The quoted speeds should not be confused with the speed at which the Customer receives and sends internet access data through the public internet, as such speeds are impacted by many factors beyond Rapid Fiber's control. Actual internet speeds vary due to many factors including the capacity or performance of a computer and its configuration, wiring and any wireless configuration, destination and traffic on the internet, internal network or other factors at the internet site with which the Customer is communicating, congestion on the network, and the general speed of the public internet. The actual speed may affect the Customer's on-line experience, including ability to view streaming video and speed of downloads. Except as otherwise provided by law, Rapid Fiber reserves the right to implement network management controls to optimize and ensure that adequate speed and data transfer is available to all Rapid Fiber Customers.

Accordingly, the Customer understands and agrees that Rapid Fiber does not guarantee that any particular amount of bandwidth on the Service will be made available to the Customer or that any speed or throughput of the Customer's connection to the Service will be available to the Customer. The Service is subject to both scheduled and unscheduled maintenance outages; however, Rapid Fiber will strive to minimize the impact of scheduled maintenance outages.

The Customer understands that the Service requires electricity at the service location. Therefore, in the event of an electrical outage, the Router/Gateway will not receive power. If this occurs, the Customer's phone service, if applicable, including any medical or security alert systems, such as E-911, will not be available to the Customer unless the ONT and phone are powered by an Uninterruptible Power Supply (UPS). If the Customer has a medical alert system or security equipment, he or she is strongly encouraged to utilize and maintain a battery backup. It is the Customer's responsibility to provide, maintain, monitor, and/or replace the battery backup.

**TECHNICAL SUPPORT.** Rapid Fiber's Technical Support Team is available 24/7 and may be contacted at (888)857-4959 and support@rapid-fiber.com for technical support related to the Services. Onsite technical support for residential and Business Basic customers is limited to business hours and will be scheduled with the Customer. Business Plus and Business Premium Customers should refer to their SLA for information regarding onsite technical support.

**MISCELLANEOUS.** The Terms and Conditions, including this Service Agreement, represent the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements, written or oral, between the Parties relating to the Service. No term or provision herein shall be waived, and no breach or default excused, unless such waiver or consent is in writing and signed by the Party to which it is attributed. No consent by a Party to, or waiver of, a breach or default by the other, whether expressed or implied, shall constitute a consent to or waiver of any subsequent breach or default. If any provision of the Terms and Conditions shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render the Terms and Conditions unenforceable, but rather the Terms and Conditions shall be construed as if not containing the invalid or unenforceable provision. The Terms and Conditions shall be interpreted, construed, and enforced in accordance with the laws of the State of Florida without regard to its conflict of laws principles. Each Party consents to personal jurisdiction in the state and federal courts of the State of Florida.

# SUPPLEMENTAL SERVICE AGREEMENT APPLICATION TO VoIP PHONE SERVICE

The following Supplemental Service Agreement sets forth additional Terms and Conditions that shall be applicable in the event the Services requested by the Customer include VoIP Phone Service ("Voice Services").

**RATES AND CHARGES.** The rates and charges for the Voice Services are set forth in Rapid Fiber's Service and Product Fee Schedule. With respect to any Voice Services for which a rate is not specified in the Service and Product Fee Schedule, Rapid Fiber and the Customer will negotiate the applicable rate and/or charge.

**TAXES AND SURCHARGES.** In addition to the rates and charges for the Voice Services, the Customer shall be responsible for payment of all local, state, and federal taxes, fees and surcharges, however designated, imposed on or based upon the provision, sale, or use of the Voice Services, and any Equipment, excluding taxes based on Rapid Fiber's net income. The Customer shall be responsible for the payment of all surcharges in effect from time to time, including but not limited to Universal Service Fund (USF), 911 surcharges, and federal and state regulatory surcharges, as required or permitted by applicable law or regulation and/or as specified on Rapid Fiber's website.

**VoIP USAGE BILLING.** Billing for any usage associated with Voice Services, including but not limited to Directory Assistance, Toll Free Service Charges, and International Calling, will occur in arrears (for prior month's usage-based Services).

**CUSTOMER RESPONSIBILITIES.** The Customer shall be responsible for providing the following to support Voice Services: (i) an IP or analog telephone and (ii) any internal wiring required to provide telephone service to areas of the premises beyond the immediate area of Rapid Fiber's provided Equipment.

**UNAUTHORIZED USE OF VOICE SERVICES.** Rapid Fiber shall have the right (but not the obligation) to take protective action against the Customer in order to protect Rapid Fiber's network from any unauthorized use, which protective action may include, without limitation, the temporary blocking of the Customer's voice traffic until the applicable problem is resolved in Rapid Fiber's reasonable discretion. The Voice Services do not support and Rapid Fiber will not accept 976/900 and such other call types in which charges are placed on an end-user's bill and Rapid Fiber might be expected to act as a collection agent. Use of predictive dialers for more than five percent (5%) of all calls made is prohibited without Rapid Fiber's prior written consent.

**VOICE 911/E-911 SERVICE LIMITATIONS AND LIMITATION OF LIABILITY.** The Customer understands and acknowledges that access to Voice Services may be lost or may not function properly, including the ability to call for 911/E911 service, under certain circumstances, including but not limited to, the following: (i) Rapid Fiber's network or facilities are not operating; (ii) broadband connection is lost; (iii) the Customer is experiencing a power outage; (iv) electrical power to the optical network terminal (ONT) is interrupted; and/or (v) the Customer's failure to provide a proper service address or moving the Service to a different address. The Customer understands and acknowledges that in order for 911/E911 calls to be properly directed, Rapid Fiber must have the current address and if Service is moved to a different address without Rapid Fiber's approval, 911/E911 calls may be directed to the wrong emergency authority, may transmit the incorrect location address for responding, or the Voice Services (including 911/E911) may fail altogether. The Customer is required to notify Rapid Fiber of any change of address of the ONT for 911/E911 calling service to work properly. The Customer agrees that, to the maximum extent allowed by law, Rapid Fiber shall have no liability for any damages caused, directly or indirectly, by the Customer's inability to access the Voice Services, including 911/E911 services. The Customer agrees to defend, indemnify, and hold harmless Rapid Fiber, its officers, directors, managers, employees, affiliates, and agents and any others who furnish services in connection with this Agreement or the Service, from any and all claims, losses, damages, fines, penalties, costs, and expenses (including, without limitation, reasonable attorney fees) by, or on behalf of, the Customer or any third party or user of account relating to the absence, failure, or outage of the Voice Services, including 911 dialing and/or inability of the Customer or any third person or party or user of the Voice Services to be able to dial 911 or to access emergency service personnel.

**CUSTOMER PROPRIETARY NETWORK INFORMATION (CPNI).** Under federal law, the Customer has the right, and Rapid Fiber has a duty, to protect the confidentiality of information about the amount, type, and destination of the Customer's Voice Services usage (CPNI). The Customer hereby consents to the sharing of the Customer's CPNI or other personal information with Rapid Fiber and its affiliates, agents and contractors, solely for the purpose of developing or bringing to the Customer's attention any products and services, or in the event of any merger, sale of some or all of Rapid Fiber's assets, as well as in any insolvency, bankruptcy, or receivership proceeding in which CPNI or other personal information would be transferred as one of the business

assets of Rapid Fiber. This consent survives the termination of the Customer's Service and is valid until revoked by the Customer. To remove this consent at any time, the Customer must notify Rapid Fiber in writing at: Rapid Fiber Internet, Attn: Legal Department, P.O. Box 1543, Live Oak, FL 32064, by explicitly revoking the sharing of his or her CPNI or other personal information and providing the following information: (1) the Customer's name, (2) service billing address, (3) telephone number including area code, and (4) service account number. Removing consent will not affect the Customer's current Services.

FILED 3/27/2023
DOCUMENT NO. 02408-2023
FPSC - COMMISSION CLERK

BEFORE THE FLORIDA PUBLIC SERVICE COMMISSION

| | |
|---|---|
| In re: Application for certificate to provide local telecommunications service by Rapid Fiber Internet, LLC. | DOCKET NO. 20230016-TX<br>ORDER NO. PSC-2023-0115-PAA-TX<br>ISSUED: March 27, 2023 |

The following Commissioners participated in the disposition of this matter:

ANDREW GILES FAY, Chairman
ART GRAHAM
GARY F. CLARK
MIKE LA ROSA
GABRIELLA PASSIDOMO

NOTICE OF PROPOSED AGENCY ACTION
ORDER GRANTING CERTIFICATE OF AUTHORITY

BY THE COMMISSION:

NOTICE is hereby given by the Florida Public Service Commission that the action discussed herein is preliminary in nature and will become final unless a person whose interests are substantially affected files a petition for a formal proceeding, pursuant to Rule 25-22.029, Florida Administrative Code (F.A.C.).

Rapid Fiber Internet, LLC (Rapid) applied for a Certificate of Authority to provide telecommunications service, pursuant to Section 364.335, Florida Statutes (F.S.). Upon review of the application, it appears Rapid has sufficient technical, financial, and managerial capability to provide such service. Accordingly, Certificate of Authority No. 8978 is hereby granted to Rapid, which shall authorize Rapid to provide telecommunications service throughout the State of Florida.

Telecommunications service providers are required to comply with all applicable provisions of Chapter 364, F.S. and Chapter 25-4, F.A.C.

In addition, under Section 364.336, F.S., certificate holders must pay a minimum annual Regulatory Assessment Fee (RAF) if the certificate was active during any portion of the calendar year. A RAF Return notice will be mailed each December to Rapid for payment by January 30th. Neither the cancellation of its certificate nor the failure to receive a RAF Return notice shall relieve Rapid from its obligation to pay its RAF.

If this Order becomes final and effective, it will serve as Rapid's certificate. Rapid shall retain this Order as proof of its certification. We are vested with jurisdiction over this matter pursuant to Sections 364.335 and 364.336, F.S.

Based on the foregoing, it is

*FPSC - T20230005*

EXHIBIT "D"

ORDER NO. PSC-2023-0115-PAA-TX
DOCKET NO. 20230016-TX
PAGE 2

ORDERED by the Florida Public Service Commission that Rapid Fiber Internet, LLC's application for Certificate of Authority is hereby granted. It is further

ORDERED that Rapid Fiber Internet, LLC is awarded Certificate of Authority No. 8978, which authorizes Rapid to provide telecommunications service throughout the State of Florida, subject to the terms and conditions set forth in the body of this Order. It is further

ORDERED that this Order shall serve as Rapid Fiber Internet, LLC's certificate and shall be retained by Rapid Fiber Internet, LLC as proof of certification. It is further

ORDERED that the provisions of this Order, issued as proposed agency action, shall become final and effective upon issuance of a Consummating Order unless an appropriate petition, in the form provided by Rule 28-106.201, Florida Administrative Code, is received by the Commission Clerk, 2540 Shumard Oak Boulevard, Tallahassee, Florida 32399-0850, by the close of business on the date set forth in the "Notice of Further Proceedings" attached hereto. It is further

ORDERED that in the event this Order becomes final, this docket shall be closed.

By ORDER of the Florida Public Service Commission this 27th day of March, 2023.

ADAM J. TEITZMAN
Commission Clerk
Florida Public Service Commission
2540 Shumard Oak Boulevard
Tallahassee, Florida 32399
(850) 413-6770
www.floridapsc.com

Copies furnished: A copy of this document is provided to the parties of record at the time of issuance and, if applicable, interested persons.

TPS

ORDER NO. PSC-2023-0115-PAA-TX
DOCKET NO. 20230016-TX
PAGE 3

### NOTICE OF FURTHER PROCEEDINGS OR JUDICIAL REVIEW

The Florida Public Service Commission is required by Section 120.569(1), Florida Statutes, to notify parties of any administrative hearing that is available under Section 120.57, Florida Statutes, as well as the procedures and time limits that apply. This notice should not be construed to mean all requests for an administrative hearing will be granted or result in the relief sought.

Mediation may be available on a case-by-case basis. If mediation is conducted, it does not affect a substantially interested person's right to a hearing.

The action proposed herein is preliminary in nature. Any person whose substantial interests are affected by the action proposed by this order may file a petition for a formal proceeding, in the form provided by Rule 28-106.201, Florida Administrative Code. This petition must be received by the Office of Commission Clerk, 2540 Shumard Oak Boulevard, Tallahassee, Florida 32399-0850, by the close of business on April 17, 2023.

In the absence of such a petition, this order shall become final and effective upon the issuance of a Consummating Order.

Any objection or protest filed in this/these docket(s) before the issuance date of this order is considered abandoned unless it satisfies the foregoing conditions and is renewed within the specified protest period.

*FPSC · T20230005*

FILED 4/18/2023
DOCUMENT NO. 02749-2023
FPSC - COMMISSION CLERK

BEFORE THE FLORIDA PUBLIC SERVICE COMMISSION

| | |
|---|---|
| In re: Application for certificate to provide local telecommunications service by Rapid Fiber Internet, LLC. | DOCKET NO. 20230016-TX<br>ORDER NO. PSC-2023-0135-CO-TX<br>ISSUED: April 18, 2023 |

CONSUMMATING ORDER

BY THE COMMISSION:

By Order No. PSC-2023-0115-PAA-TX, issued March 27, 2023, this Commission proposed to take certain action, subject to a Petition for Formal Proceeding as provided in Rule 25-22.029, Florida Administrative Code. No response has been filed to the order, in regard to the above mentioned docket. It is, therefore,

ORDERED by the Florida Public Service Commission that Order No. PSC-2023-0115-PAA-TX has become effective and final. It is further

ORDERED that this docket shall be closed.

By ORDER of the Florida Public Service Commission this 18th day of April, 2023.

ADAM J. TEITZMAN
Commission Clerk
Florida Public Service Commission
2540 Shumard Oak Boulevard
Tallahassee, Florida 32399
(850) 413-6770
www.floridapsc.com

Copies furnished: A copy of this document is provided to the parties of record at the time of issuance and, if applicable, interested persons.

TPS

FPSC - T20230006

ORDER NO. PSC-2023-0135-CO-TX
DOCKET NO. 20230016-TX
PAGE 2

### NOTICE OF FURTHER PROCEEDINGS OR JUDICIAL REVIEW

The Florida Public Service Commission is required by Section 120.569(1), Florida Statutes, to notify parties of any judicial review of Commission orders that is available pursuant to Section 120.68, Florida Statutes, as well as the procedures and time limits that apply. This notice should not be construed to mean all requests for judicial review will be granted or result in the relief sought.

Any party adversely affected by the Commission's final action in this matter may request judicial review by the Florida Supreme Court in the case of an electric, gas or telephone utility or the First District Court of Appeal in the case of a water and/or wastewater utility by filing a notice of appeal with the Office of Commission Clerk and filing a copy of the notice of appeal and the filing fee with the appropriate court. This filing must be completed within thirty (30) days after the issuance of this order, pursuant to Rule 9.110, Florida Rules of Appellate Procedure. The notice of appeal must be in the form specified in Rule 9.900(a), Florida Rules of Appellate Procedure.

*FPSC - T20230005*